## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS

**Ger-Lih Lin, an Individual,**

        **Plaintiff,**

**Chase Real Estate, LLC, an Illinois Limited Liability Company, Citypoint Illinois LLC, an Illinois Limited Liability Company, Deodar, Evergreen, & Butternut EC LLC, an Indiana Limited Liability Company, TCF National Holdings, Inc., a Delaware Corporation, Marcin Chojnacki, an Individual, Laurena Mikosz, an Individual, Kendall Murphy, an Individual, Robert Rixer, an Individual, 1st Midwest Financial, Inc., an Illinois Corporation, Five Star Construction LLC, an Illinois Limited Liability Company, First National Financial Inc., an Illinois Corporation; Mainstreet Property Management an Illinois Limited Liability Company; EJ Investment Group, Inc. a Delaware Corporation; FNBO Property Management LLC, an Illinois Limited Liability Company, Kathleen Long, an Individual, Rachel Irwin, an Individual, Midwest Title And Closing Services LLC an Illinois Limited Liability Company, BLM Title Services, LLC d/b/a Lakeland Title Services, an Illinois Limited Liability Company, and Brenda Murzyn, an Individual, The Law Office of Brenda Murzyn, P.C., an Illinois Professional Corporation**

**Case No.**

**Judge:**

**Magistrate:**

## <u>COMPLAINT</u>

NOW COMES the Plaintiff, Ger-Lih Lin, by and through his attorneys, Gaspero &

Gaspero, Attorneys at Law, P.C., and in complaining against Chase Real Estate, LLC, an Illinois

Limited Liability Company, Citypoint Illinois LLC, an Illinois Limited Liability Company,

Deodar, Evergreen, & Butternut EC LLC, an Indiana Limited Liability Company, TCF National

Holdings, Inc., a Delaware Corporation, Mainstreet Property Management an Illinois Limited

Liability Company, EJ Investment Group, Inc. a Delaware Corporation, Marcin Chojnacki, an

Individual, Laurena Mikosz, an Individual, Robert Rixer, an Individual, Five Star Construction

LLC, an Illinois Limited Liability Company, First National Financial, Inc. an Illinois

Corporation, Kathleen Long, an Individual, Kendall Murphy, an Individual, 1st Midwest

Financial, Inc., an Illinois Corporation, FNBO Property Management LLC, an Illinois Limited

Liability Company, Rachel Irwin, an individual, Midwest Title And Closing Services LLC an

Illinois Limited Liability Company, BLM Title Services, LLC d/b/a Lakeland Title Services, an

Illinois Limited Liability Company, Brenda Murzyn, an Individual, and the Law Office of

Brenda Murzyn, P.C., an Illinois Professional Corporation, allege as follows:

## JURISDICTION

This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 in that the Plaintiff asserts claims arising under the Racketeer Influenced and Corrupt Organizations Act 18, U.S.C. § 1962.

This Court has jurisdiction over this action pursuant to 28 U.S. Code § 1332(a)(1) whereas the Plaintiff is a citizen of the State of California, and the Defendants are citizens of Illinois and Delaware. The amount in controversy, exclusive of costs, exceeds $75,000.

This Court has supplemental jurisdiction over the Plaintiff's state law claims, pursuant to 28 U.S. § 1367.

## VENUE

Venue is proper in this District pursuant 18 U.S.C. § 1965 and 28 U.S. Code § 1391(c)(2), whereas multiple Defendants are residents of Illinois and the real estate at issue is located in Northern Illinois and Northern Indiana.

Venue is proper in this District pursuant to 18 U.S.C. § 1965 and 28 U.S.C. § 1391 because Defendants are subject to personal jurisdiction in this judicial district and reside in this district.

## PARTIES

1.      Plaintiff Ger-Lih Lin ("Ger-Lih"), an individual, is a California citizen.

2.      Defendant Marcin Chojnacki ("Chojnacki"), an individual, is an Illinois licensed real estate broker and an Illinois citizen.

3.      Defendant Kendall Murphy ("Murphy"), an individual, is an Illinois citizen.

4.      Defendant Robert Rixer ("Rixer"), an individual, is an Illinois citizen.

3

5.     Defendant 1st Midwest Financial, Inc., is an Illinois Corporation and a citizen of Illinois in that its principal place of business is in the State of Illinois.

6.     The president of 1st Midwest Financial, Inc. is Defendant Kendall Murphy. Despite its name, 1st Midwest Financial, Inc. has no relationship with First Midwest Bank (First Midwest Bancorp, Inc.) the widely known, publicly traded commercial banking and financial services institution that carried the name until it was acquired by Old Republic Bank in 2022.

7.     At all times relevant herein, Defendant Kathleen Long ("Long") was the cohabitant and paramour of Chojnacki. Defendant Kathleen Long is a citizen of Illinois.

8.     Defendant First National Financial Inc. is an Illinois Corporation and a citizen of Illinois in that its principal place of business is in Illinois.

9.     Defendant Long is the President and Secretary of Defendant First National Financial, Inc. and the signatory on its bank accounts.

10.     Defendant TCF National Holdings, Inc. is a Delaware Corporation with its principal place of business in Illinois.    Defendant TCF National Holdings, Inc. is a citizen of both Delaware and Illinois.

11.     Defendant Long, an individual, is the owner and President of TCF National Holdings, Inc. and signatory on its bank accounts.

12.     Defendant Deodar, Evergreen and Butternut EC LLC (Deodar) is an Indiana Limited Liability Company and a citizen of Delaware and Illinois, in that it is owned and managed by Defendant TCF National Holdings, Inc., a Delaware Corporation with its principal place of business in Illinois.

13.     Defendant Chase Real Estate, LLC ("Chase Real Estate") is an Illinois Limited Liability Company with its principal place of business in the State of Illinois. The manager, and,

4

on information and belief, the sole member of Chase Real Estate, is Christian Chase, a citizen of Illinois.

14.     Defendant Laurena Mikosz ("Mikosz"), an individual, is an Illinois licensed real estate broker and an Illinois citizen.

15.     Defendant FNBO Property Management LLC (FNBO) is a terminated Illinois Limited Liability Company that, at all times relevant, was managed and owned by Lukasz Mikosz, Defendant Mikosz's husband.  FNBO is a citizen of Illinois in that all the members of FNBO are citizens of Illinois.

16.     Five Star Construction Services LLC ("Five Star") is an Illinois Limited Liability Company, managed by Defendant Mikosz's husband, Lukasz Mikosz, along with two other managers.  Defendant Five Star is a citizen of Illinois in that its members are citizens of Illinois.

17.     Defendant Rachel Irwin is an attorney licensed to practice law in the State of Illinois and a citizen of Illinois.

18.     Defendant Midwest Title and Closing Services LLC ("Midwest Title") is an Illinois Limited Liability Company owned and controlled by Defendant Rachel Irwin, an Illinois citizen, Defendant Chojnacki, an Illinois citizen, and XYZABC, Inc., a Delaware corporation with its principal place of business in Illinois.  Defendant Rachel Irwin is President of XYZABC, Inc. XYZABC, Inc. is a citizen of Illinois and Delaware. Defendant Midwest Title is a citizen of Illinois and Delaware in that all its members are citizens of Illinois and Delaware.

19.     Defendant Mainstreet Property Management ("Mainstreet Management") is a terminated Illinois Limited Liability Company that was, at all times relevant, owned and controlled by EJ Investment Group, a citizen of Illinois and Delaware.  Defendant Mainstreet

Management is a citizen of Illinois and Delaware in that all of its members are citizens of Illinois and Delaware.

20.     Defendant EJ Investment Group Inc. is a Delaware Corporation with its principal place of business in Illinois.  Defendant EJ Investment Group, Inc. is a citizen of both Delaware and Illinois.

21.     Defendant EJ Investment Group Inc., which controls Mainstreet Management, is owned and controlled by Defendants Chojnacki and Rixer.

22.     Defendant Citypoint Illinois LLC ("Citypoint Illinois") is an Illinois Limited Liability Company that was, at all times relevant, owned and controlled by Citypoint Group, Inc., a Delaware corporation with its principal place of business in Illinois. Defendant Citypoint Illinois is a citizen of Illinois and Delaware in that all of its members are citizens of Illinois and Delaware.

23.     "Citipoint Properties" appears, at all times relevant, to have been an un-incorporated enterprise organized by Chojnacki which held itself out as a real estate investment company for the purposes of inducing and capitalizing from out-of-state investors in connection with Illinois and Indiana real estate.  On December 28, 2022 this un-incorporated enterprise organized itself as Defendant "Citypoint Illinois LLC" an Illinois Limited Liability Company (and Illinois and Delaware citizen). The allegations set forth herein cover time periods when this enterprise was both un-incorporated and incorporated.

24.     "Flip Chicago" appears to have been an un-incorporated enterprise organized by Chojnacki which held itself out as a real estate investment company for the purposes of inducing and capitalizing from out-of-state investors in connection with Illinois real estate.

25.     BLM Title Services, LLC d/b/a Lakeland Title Services, is an Illinois Limited Liability Company (Lakeland Title) and is a citizen of Illinois.

26.     Brenda Murzyn, an Individual, is an attorney licensed to practice law in Illinois and citizen of Illinois (Brenda).  Brenda is the owner and a Manager of Lakeland Title and signatory on its bank accounts.

27.     The Law Office of Brenda Murzyn, P.C. (Law Office of Brenda) is an Illinois Professional Corporation and a citizen of Illinois.  Brenda is the President of the Law Office of Brenda.

28.     Lakeland Title, Brenda, and the Law Office of Brenda, operate out of the same location at 1300 Iroquois Ave, Naperville Illinois (Suites 100 and 125, respectively).

29.     At all times relevant herein, Defendants Irwin, Chojnacki, Mikosz, Mainstreet Management, Rixer, and EJ Investment Group all operated out of the same office space located at 25-41 E. Main Street Suite 204, Roselle, IL 60172.  Rixer, Chojnacki, Irwin, Long, and Murphy are signatories on various bank accounts and transfer funds, via Zelle, ACH transfer, and bank transfers, amongst the various entities that are the subject of this matter.

30.     Brenda, along with Michael Okoye, associate attorney with the Law Offices of Brenda, and Jaime Eddy, an attorney no longer licensed to practice law in the State of Illinois, and never licensed to practice law in the State of Indiana, are listed as the "Investor Attorney" legal team on the Chase Foreclosure System website (www.chaseforeclosure.com) (See Exhibits 1 and 2).

31.     At all relevant times herein, Defendant Chase Real Estate was not licensed in any capacity to provide real estate services as a real estate agent or broker or brokerage firm in

Indiana, but so provided said services and/or solicited to provide said services in Indiana despite not being licensed in Indiana.

32.     At all relevant times herein, Defendant Laurena Mikosz was not licensed in any capacity to provide real estate services as a real estate agent or broker in Indiana, but so provided, or solicited to provide, said services in Indiana despite not being licensed in Indiana.

33.     At all relevant times herein, Defendant Marcin Chojnacki was not licensed in any capacity to provide real estate services as a real estate agent or broker in Indiana and also was not licensed in any capacity to provide property management services in Indiana, but so provided said services in Indiana despite not being licensed in Indiana.

34.     At all times relevant herein, Defendants Mainstreet Management and Defendant EJ Investment Group were not licensed to provide property management services in Indiana but provided said services in Indiana despite not being licensed.

35.     At all relevant times herein, Defendant Midwest Title and Closing Services LLC was not licensed in any capacity as a title insurance producer or agent in Indiana, but provided said services in this case in Indiana, despite not being licensed in Indiana.

36.     At all relevant times herein, Defendant Rachel Irwin was not licensed to practice law in Indiana, but served as Seller's attorney and prepared the title transfer documents, including the deeds, and performed other legal and title services for the Indiana real estate closings in this case, despite not being licensed in Indiana.

37.     At all times relevant herein, Defendant Brenda Murzyn and the Law Office of Brenda Murzyn, P.C., performed legal services and served as Plaintiff's attorney in the Indiana transaction, despite not being licensed to engage in the active practice of law in Indiana.

38.     Brenda's title company, Defendant Lakeland Title, acted as escrow agent for all of Plaintiffs' closings, despite not being the closing title company in the Indiana transaction, as Lakeland Title cannot perform title services in Indiana.

## ALLEGATIONS COMMON TO ALL COUNTS

### Part I of the Fraud: Luring the Investor –
### Chase Real Estate Services and "Flip Chicago"

39.     Ger-Lih, who goes by the nickname Tony, is a young working professional who came to the United States from Taiwan.  He wanted to invest in real estate to provide for himself and his family.

40.     In July of 2021, Plaintiff Ger-Lih responded to a social media advertisement inviting the reader to contact "CitiPoint Properties" which identified itself as a source for connecting investors to undervalued and underperforming properties – carrying the promise of rapidly increasing equity and high cash flow.  This alleged connection between the target investor and the alleged owner of "off-market" properties was referred to as an offering of "directly sourced" properties.

41.     Ger-Lih's query prompted a response from Defendant Mikosz. The response from Mikosz evolved into a sustained text, phone and Zoom meeting interaction through which Mikosz drew Ger-Lih into the scheme giving rise to this action.

42.     Mikosz told Ger-Lih that she was a real estate broker with Chase Real Estate LLC.  Mikosz told Ger-Lih that "CitiPoint" is the same company as Chase Real Estate LLC.

43.     Mikosz actively led Ger-Lih to believe that since she would represent him as an agent of Chase Real Estate, and because "CitiPoint" is the same company as Chase Real Estate, that the transactions would be safely negotiated and consummated under the auspices of Chase

Real Estate. Mikosz told Ger-Lih that her managing broker was Chojnacki, also a Chase Real

Estate agent.

44. At all times relevant herein, the website for CitiPoint was very similar to the

website for Chase Real Estate (See printed copy of the Chase website attached as Exhibit 3 and

the CitiPoint Real Estate Website at Exhibit 4).

45. The Chase Real Estate and CitiPoint websites include many photos of the same

persons – including Chojnacki and Mikosz. The professional portrait photographs of Chojnacki

and Mikosz are similar photographs on both the CitiPoint and the Chase Real Estate websites.

(See Exhibits 3 and 4).

46. Mikosz told Ger-Lih that her company reaches out to building owners – mostly

struggling local landlords – to learn if they are interested in selling their properties and then

introduces their properties to the investors. Because these are off-market properties, the

implication is that the investor will be able to purchase the property at a steep discount.

47. Mikosz further told Ger-Lih that her company was affiliated with a property

management company that would help the new owner as the property manager, namely

Mainstreet Management.

48. Mikosz promised Ger-Lih that if he invested, he would be purchasing a building

that was underperforming because it was owned and self-managed by a local landlord.

49. The false promise that the property was owned and self-managed by a local,

unprofessional landlord allowed Mikosz to foster the proposition that 1) the property could be

acquired from the local individual at a bargain price and 2) once the property was managed

properly (with the help of Mikosz's affiliate property management company, Mainstreet

Management), the investor (Ger-Lih) could expect substantial cash flow.

50.     As his agent, Mikosz accordingly began sending Ger-Lih "CitiPoint" multifamily deals that she encouraged him to purchase.

51.     At the same time, however, Mikosz also recommended other types of "deals" to Ger-Lih, namely Chase "Flip Chicago" deals.

52.     Mikosz explained that, in addition to the Chase "CitiPoint" multifamily deals, he could also participate in single family property flips through the Chase "Flip Chicago" system. Mikosz told Ger-Lih this involved purchasing single family homes at a greatly reduced price from foreclosing banks that he would then rehab using the Chase "Flip Chicago" system and then sell quickly for a profit or "flip."

53.     Specifically, Mikosz told Ger-Lih that the Chase "Flip Chicago" system promised to assist the investor in the purchase of these foreclosing properties from foreclosing banks and then provide post-closing services relative to renovating the property so that it could be quickly resold at a profit (or "flipped").

54.     The website for Flip Chicago, like the Chase and CitiPoint websites, include many of the same people and again, is very similar to the Chase and CitiPoint websites.  (See Exhibit 5).

55.     For the Chase "Flip Chicago" deals, Mikosz stressed to Ger-Lih that the property flips would be done quickly after closing – within a three-month timeframe (if not sooner) using the Chase recommended service providers.  She assured Ger-Lih that to make this possible, she would find properties for him that were in a suitable condition to purchase from the foreclosing banks that would allow reasonable renovations within this short timeframe.

56.     Ger-Lih understood from the information provided to him by Mikosz that an important component in the Chase Real Estate Flip service would be the Chase team's expert

11

assistance in locating and making offers on suitable investment properties from foreclosing banks.

57.     Mikosz, as his agent, also began sending Ger-Lih Chase "Flip Chicago" deals she encouraged him to purchase.

58.     Accordingly, the Chase "Flip Chicago" scheme controlled the single family rehab and "flip" properties purchased by Ger-Lih.

59.     The Chase "CitiPoint" scheme controlled the "multi-family" hold and rent property purchased by Ger-Lih.

60.     Ger-Lih was a victim of both the "Flip Chicago" and "CitiPoint" schemes.

61.     There are currently twelve other related actions pending in the United States District Court for the Northern District of Illinois involving the same group of defendants: *Shankar v. Fairview Ave. Props. LLC*, No. 23-cv-01469; *Abbas v. Mikosz*, No. 23-cv-01691; *Sor v. TCF Nat'l Holdings, Inc.*, No. 23-cv-02401; *Chen v. Chojnacki*, No. 23-cv-02520; *Michel v. Chojnacki*, No. 23-cv-02546; *Said v. Chojnacki*, No. 23-cv-02858; *Haynes v. Fairview Avenue Properties, LLC*, No. 23-cv-01596; *Stafford v. Chojnacki*, No. 23-cv-03173; *Hui v. Chojnacki*, No. 23-cv-03430; *Fernandez v. Chojnacki*, No. 23-cv-04406; *Malik et al. v. Prairie Raynor, No. 23-cv-1182; and Weiner v Chojnacki, No. 23-cv-16573.*

**Flip Chicago:  The REO and Imposter Bank Seller Portion of Geh-Lin's Fraud**

62.     Mikosz told Ger-Lih that she would represent him in the purchase of single family homes from banking institutions which had foreclosed on the previous owners/borrowers.

63.     Mikosz represented that the properties were Real Estate Owned ("REO") properties.

64.     REO is a term of art referring to a lender-owned property that went unsold at a foreclosure auction. Properties become REO when borrowers default and the lender repossesses and attempts to sell them.  The lender bank takes ownership of a foreclosed property when it fails to sell at auction at the amount sought to cover the loan. These REO properties are generally understood to be attractive to certain investors because they can be acquired from the foreclosing bank at a significantly discounted price.

65.     Mikosz assured Ger-Lih that all the properties Plaintiff would be making offers on were REO properties being offered for sale by the REO bank.

66.     Accordingly, a significant component to the investment was the discounted price for which the property could be acquired from the foreclosing bank.

67.     Mikosz specifically represented that she would assist Plaintiff in crafting an appropriate offer to the REO bank.

68.     She assured Ger-Lih that she and her company had an ongoing professional relationship with these banks, and therefore that would be a reason to expect respectable treatment during the offer process.

69.     The truth was that the seller of the property was not an REO bank, but rather a corporation owned by an affiliate of Mikosz and Chojnacki, with a deceptive and deliberately misleading name ("1st Midwest Financial, Inc.").

**The Imposter Bank:  1st Midwest Financial, Inc.**

70.     Despite its misleading name, Defendant 1st Midwest Financial, Inc., has no affiliation with First Midwest Bancorp., the widely known bank headquartered in Chicago which was one of the largest banking institutions in the United States until its 2022 acquisition by Old National Bank.

71.     Defendant 1st Midwest Financial, Inc. has no banking license or any other financial services credentials.

72.     In furtherance of their overall scheme, Defendants or their affiliates have formed corporations using other major bank names, such as BMO (Bank of Montreal).

73.     Nonetheless, as part of Defendants' overall scheme, 1st Midwest Financial, Inc., posing as a bank, previously acquired (or contracted to acquire) the property from the actual REO bank at the discounted price promised to Ger-Lih.

74.     This impostor bank then sold the property to Ger-Lih at an inflated price with the other Defendants acting as their accomplices.

75.     Thus, the primary component of Defendants' fraud scheme was to mislead Ger-Lih into believing he was buying a property at the REO price directly from the REO bank.

76.     The offer and acceptance process that Mikosz and Chojnacki described to Ger-Lih was a farce.  The purchase price of a property was unilaterally determined by the affiliated Defendants before any so-called offer was crafted and "accepted."

77.     When Ger-Lih actually purchased a property from the imposter bank, he paid the undisclosed mark-up.  Thus, Defendants and their affiliates at the impostor banks which sold the properties to Ger-Lih deprived him of the value of the discount embedded in the promise that the acquisition would be from an REO lender.

78.     This complex of misleading statements, active concealments, deceptive practices and failures to disclose occurred notwithstanding the fact that Mikosz was Ger-Lih's Designated Real Estate Broker and Chase Real Estate was Ger-Lih's Designated Real Estate Brokerage Firm in the purchase transactions.

79.     The impostor bank, 1st Midwest Financial, Inc., states on its corporate filings that its President is Defendant Kendall Murphy. Kendall Murphy's address on the corporate filings is 1046 Midwest Road, Northbrook, Illinois – which is a non-existent address (likely contrived to mislead the public to believe that the "bank" was located on the vanity namesake for the street, a common practice for very large corporations).   (See Exhibit 6).

80.     When a legitimate address was required for a closing statement or for a deed, 1st Midwest Financial, Inc. provided the address of 30W121 Estes Street in Naperville, Illinois – which was a foreclosure property with an apparently abandoned house near an industrial area in northwestern Naperville. (See Exhibit 7).

**The Springfield Avenue Property**

81.     On March 1, 2022, Mikosz sent Ger-Lih information relating to a single-family home at 11825 Springfield Ave., Alsip (unincorporated Chicago) (the "Springfield Avenue" property).

82.     In the March 1, 2022 email, Mikosz told Ger-Lih that the Springfield property was a foreclosure in Alsip, "an attractive area."  (See initial email as Exhibit 8).  Mikosz described this foreclosure property as "attractive outside."  (See Exhibit 8).

83.     In follow-up conversations, Mikosz told Ger-Lih that the Springfield property would be an ideal REO to quickly flip for a profit and was a bargain for the purchase price of $195,000.00.

84.     Mikosz assured Ger-Lih that he would make money on the Springfield Avenue property and that it was a great deal.

85.     Throughout the transaction, Mikosz referred to Springfield Avenue as a foreclosure REO and that 1st Midwest Financial was the foreclosing bank.

86. Ger-Lih believed Mikosz's representations that the Springfield Avenue property was a foreclosure REO and that the Seller was a bank because the Seller's name – 1st Midwest Financial, Inc., sounded like the bank.

87. Eight days after receiving Mikosz's email, Ger-Lih entered into an agreement to purchase the Springfield Avenue property on March 9, 2022. Chase Real Estate is listed on the contract as "Buyer's Designated Brokerage." Mikosz is listed as "Buyer's Designated Agent." 1st Midwest Financial, Inc. is the seller. The real estate contract was conjoined with and appended to the "Chase Real Estate Guide to Investing" (See Springfield Purchase Agreement, attached as Exhibit 9).

88. On May 31, 2022, Plaintiff closed on the Springfield Property. The Seller was 1st Midwest Financial, Inc. The purchase price was $195,000.00.

89. Chase Real Estate received a $6,825.00 commission on the sale of the property.

90. Contrary to the representations of Mikosz, and without any disclosure to Ger-Lih, on March 2, 2022, Defendant 1st Midwest Financial, Inc. acquired the property from David and M. Jean Steed, private parties, in the amount of $181,500.00. There was never a foreclosure.

91. Lakeland Title acted as the title company for the Springfield sale to Ger-Lih and the closing took place at its Naperville office location, in the suite next to Brenda's law office. Lakeland Title received $5,110 in closing, settlement, and title fees.

92. The Lakeland Title Commitment, signed by Brenda, is one of several acts evidencing complicity in the fraud scheme.

93. Firstly, the Springfield Avenue title commitment is dated February 1, 2022. Ger-Lih and his lender are the proposed insureds. (See Exhibit 10).

94.     However, Ger-Lih did not know about this property until he was introduced to it by Mikosz on March 1.  He did not contract to buy the property until March 9, 2022. The closing was set on May 31, 2022. (See Exhibits 8 and 9).

95.     There is no legitimate reason for Brenda to provide a title commitment back-dated to February 1, 2022 other than to conceal title facts.

96.     The commitment provides at Paragraph 9 of Schedule B (Page 9 of Exhibit 10):

> **24 MONTH CHAIN OF TITLE:**
>
> **The last deed in the chain of title shows that David Steed and M Jean Steed took title by Warranty deed dated June 12, 1991 and recorded June 21, 1991 as document number 91303528.**
>
> **We find no other conveyances of the subject property within the last 24 month period.**

97.     The reason Lakeland Title provided the backdated title commitment was to avoid reporting the March 2, 2022 sale recorded on March 22, 2022 from the long-time owner to Defendant 1st Midwest Financial. This was done in order to hide the fact that the transfer from private party Steed to contract seller (and imposter bank Defendant) 1st Midwest Financial was a for-value, regular market purchase from a private party and not a foreclosure or judicial deed. (See Exhibits 11 and 12).

98.     The misleading title commitment ultimately had the effect of providing cover for the intervening undisclosed mark-up in price.

99.     The title commitment, signed by Brenda, further misleadingly states:

> **"The Title is, at the Commitment Date, vested in:**
> **Deed to be Vested to 1st Midwest Financial Inc."**

(See Title Commitment, attached as Exhibit 10).

100.    A primary purpose of a title commitment is to inform the buyer and his agents of the current title owner of the property.

101.    Brenda's title company, Lakeland Title, could not know about a deed "to be vested" with the imposter bank unless it was part of the scheme. Lakeland Title's obfuscation provided additional cover for the imposter bank fraud.

102.    Mikosz and the affiliated Defendants had told Ger-Lih he was buying foreclosing property from a bank. Ger-Lih believed this because the imposter bank – 1st Midwest Financial – sounded like a bank.

103.    Lakeland Title needed to misrepresent the true vested title because if Ger-Lih had accurate information as to the actual title holder, he would have 1) known there was no bank and 2) would have seen the transfer to the intervening "middle-man" interposed there by Defendants to hide the intervening undisclosed mark-up.

104.    Put another way, the misleading title prevented exposure of Defendants' ruse that the Defendants were assisting Ger-Lih acquire a foreclosure property at the expected bargain price.

105.    Defendant Lakeland Title provided the cover of a legitimate real estate title company, oversaw the conduct and behavior of Irwin, as seller's title agent, received closing, settlement and escrow title fees from 1st Midwest Financial and Ger-Lih, and coordinated the misleading title search, title report, chain of title, and issued the title commitment.

106.    As part of the Chase Flip Chicago and/or CitiPoint schemes, Defendant Brenda, individually and as an attorney with the Law Offices of Brenda Murzyn, also at times represented "investor buyers" as buyer's attorney in Chase Real Estate transactions, further

facilitating the fraud regarding the true owners of the subject transactions. (www.chaseforeclosure.com) (See Exhibits 1 and 2).

107.    Exhibit 2 delineates Murzyn and unspecified associates as the Chase "Legal Team" for the Chase foreclosure investment scheme. The presence of an affiliated legal team facilitated the scheme by removing the checks and balances that might otherwise be expected to challenge and or persistently investigate the Defendants' failures to disclose and calculated omissions.

108.    Defendant Mikosz and Chase Real Estate at all times held themselves out to be agents of and acting on behalf of Ger-Lih.

109.    At no time did Defendant Mikosz or any other Chase agent disclose any conflict of interest.

110.    Defendant Mikosz made misrepresentations to Ger-Lih to induce him to consummate the Springfield Avenue transaction and communicated to Ger-Lih as a representative of Chase using her Chase Real Estate email account and Chase Real Estate resources.

111.    In addition to the Springfield purchase, Defendants Mikosz and Chojnacki sent other Chase Real Estate advertisements to Ger-Lih for more Flip Chicago and CitiPoint deals.

**Indiana:  The Evergreen Property**

112.    Mikosz introduced Ger-Lih to the property known as 3934 Evergreen St., East Chicago, Indiana (the Indiana Property).  (See Exhibit 13).

113.    Mikosz did not disclose that neither she, nor Chase Real Estate, were licensed in Indiana to provide real estate brokerage services.

114. Mikosz sent Ger-Lih a Chase link to the Indiana Property. This link has since been deactivated.

115. Mikosz told Ger-Lih that the private landlord, one Bernard Carter, was tired of managing the property and was eager to sell. Mikosz assured Ger-Lih that he could buy this property for $320,000, raise rents, and then refinance it at a higher building value, thereby paying off the entire $320,000 purchase price. Mikosz assured Ger-Lih that based on her numbers, Ger-Lih would easily get his entire down payment back and achieve profit. Mikosz assured Ger-Lih that this deal would be easy. He just had to purchase the property at the recommended $320,000 price and raise rents to market rates.

116. Importantly, Mikosz stressed to Ger-Lih that no rehab was needed on the Indiana property.

117. The August 5, 2021 Purchase Agreement for the Indiana property identified Defendant Deodar, Evergreen, Butternut EC LLC (Deodar) as the Seller and was signed by Kathleen Long for Seller. Defendant Irwin was identified as Seller's attorney. The purchase price for the Indiana property was $320,000.00. (See Exhibit 14).

118. At the time of this purchase agreement, Defendant Deodar did not own the Indiana property. This was because Defendants were negotiating the purchase of the Indiana property from Mr. Bernard Carter themselves for $150,000 – an amount that was $170,000 less than what they were conspiring to get Ger-Lih, as their client, to pay without disclosure.

119. Because this was an Indiana real estate purchase, it was not physically possible for Brenda's Naperville, Illinois title company, Lakeland Title, to provide title closing services.

120.    In Indiana transactions, where Brenda's Naperville title company, Lakeland Title, could not provide title services, a different strategy was contrived for Defendants to conceal their fraud from the victim.

121.    Brenda's Naperville title company, Lakeland Title, either acted as escrow agent in charge of holding and controlling the victim buyer's funds, *Abbas v. Page Street Properties LLC, et al.,* 23 cv 01691, or Brenda, although not licensed to engage in the active practice of law in Indiana, would act as attorney for the buyer/victim.  *See Hui v. Chojnacki,* 23 cv 03430, *Fernandez et al. v. Deodar, et al.,* 23 cv 04406.

122.     In this case, both occurred.  Brenda's title company acted as escrow agent and Brenda acted as Ger-Lih's attorney despite not being licensed to do so.

123.    Defendants provided Ger-Lih a title commitment listing Bernard Carter as owner of record, not Deodar.  See Chicago Title Insurance Co. Title Commitment at Exhibit 15.

124.    It is important to highlight that because Brenda's title company was not the title company in the Indiana transaction, the owner of record on the title commitment could not be manipulated to be misleading (i.e., backdated or "Deed to be Vested" language for owner of record). Defendants had to cover up their fraud in other ways.

125.    Defendants ordered title through Chicago Title Company listing Bernard Carter as seller in the transaction to generate a title commitment.  This is because there was no other way to generate a title commitment at this time since they did not yet own the property and were still actively purchasing it from Bernard Carter themselves.

126.    Ger-Lih inquired about why the Seller on his purchase contract was Deodar, a Limited Liability Company because the seller on the Chicago Title title commitment was

21

Bernard Carter. Mikosz assured Ger-Lih that the seller was merely doing a business restructure involving a quitclaim deed between the seller and his own Limited Liability Company.

127.     Ger-Lih fully believed Mikosz that the true Seller was Mr. Bernard Carter and the Deodar LLC was Mr. Carter's LLC.   Ger-Lih believed Mikosz and believed she was his agent and was working on his behalf.

128.     In truth, as of August 3, 2021, unbeknownst to Ger-Lih, Defendant Deodar did not own the property yet, but was in the process of purchasing it themselves from the real local landlord, Mr. Bernard Carter for $150,000.00, $170,000 less than the $320,000 they convinced Ger-Lih to pay after the bogus negotiation.

129.     Unfortunately, Ger-Lih believed Mikosz and thought the $320,000 was a good deal. In the following weeks he began to work on acquiring financing to purchase the Indiana property pursuant to his August 3, 2021 contract.

130.     As part of the loan process, Ger-Lih learned that, contrary to Mikosz's representations, the Indiana property did need some rehab.  The lender Ger-Lih was working with was unable to complete financing for a property that needed rehab, so the deal languished and Mikosz steered Ger-Lih to other "deals" she thought could close faster.  In the intervening time, while this deal was languishing, the Defendants convinced Ger-Lih to participate in other "foreclosure" deals similar to the fraudulent rubric set forth above in the Springfield transaction.

131.     Ger-Lih's initial real estate attorney tried to obtain due diligence documents, including rent rolls and other financial information about the property but was unable to do so.

132.     This attorney stopped responding to Ger-Lih's communications and, accordingly, abandoned representation of Ger-Lih without explanation.

133.     Mikosz told Ger-Lih that Brenda should be Ger-Lih's attorney in this transaction.

134. Brenda assumed representation of the Indiana transaction and did not tell Ger-Lih there were any problems with the transaction. (See Brenda email attached as Exhibit 16).

135. Ger-Lih had to search a new lender for the Indiana transaction so that he could work on the rehab which was represented as purely cosmetic because Mr. Carter had owned the building for a long time and had not updated it.

136. Mikosz recommended her lender for the Indiana transaction and told Ger-Lih the Purchase Agreement had to be updated. On June 10, 2022, Ger-Lih signed a new Purchase Agreement, only this time the Seller was TCF National Holdings. The Purchase Agreement was signed again by Kathleen Long on behalf of the Seller. (See Exhibit 17).

137. Mikosz also convinced Ger-Lih to let her obtain the appraisal to give to her lender to support the $320,000.00 sale price.

138. Mikosz told Ger-Lih that since this was all the same transaction, and the Seller had simply been undergoing business restructuring, hence the different business names, Ger-Lih's earnest money deposited with Lakeland Title in August 2021 was still applicable to the updated June 2022 agreement.

139. Ger-Lih closed on the Indiana Evergreen property on October 17, 2022 at which time his LLC, Achilles Real Estate Holdings LLC acquired title to the property. Ger-Lih paid $320,000 for the property. Irwin acted as agent for Deodar.

140. Unbeknownst to Ger-Lih, Deodar had acquired the property from Mr. Bernard Carter on October 25, 2021 for $150,000.

141. Contrary to Defendants' representations, Deodar was not Mr. Carter's business restructure.

142.     Brenda's placement as Ger-Lih's attorney prevented him from learning through due diligence any of these facts as she never alerted him to any concern regarding the transaction.

143.     Following the October 17, 2022 closing, Ger-Lih attempted to rehab the Indiana property.  Defendant Mainstreet Management, despite not being licensed as a property manager in Indiana, began managing the property and coordinating the rehab work.

144.     Mikosz attempted to solicit more "deals" to Ger-Lih.

145.     Ger-Lih ultimately purchased four properties from Defendants, all under the understanding that he was purchasing either from foreclosing bank 1st Midwest Financial (the Springfield Avenue property, an Elmwood Park property, and a South Holland property) or a local disorganized landlord (the Indiana property).

146.     For the Springfield Avenue Property, the Elmwood Park Property, and the South Holland Property, the title commitments signed by Brenda on behalf of Lakeland Title inaccurately reported the true owner of record and prevented Ger-Lih from knowing the title owner fraud.

147.     Mikosz attempted to convince Ger-Lih to purchase another Indiana property allegedly also owned by local landlord Mr. Carter, which was ultimately being transferred into Mr. Carter's Deodar entity due to business restructure:  the "Butternut" property.

148.     Ultimately, this Butternut property sale did not go through because by this time Ger-Lih was becoming disillusioned as a consequence of the other transactions set forth herein.

149.     Defendants' activities continued well into 2023 and after the first of the other related cases had been filed, *Malik v. Prairie Raynor,* 2023 cv 1182 and Defendant Chase Real Estate had filed its appearance in the *Malik v. Prairie Raynor* matter.

150.    At this time, Ger-Lih found that he was paying Defendants exorbitant sums for property management work and contractor work that was either not performed, or not performed adequately.  He also learned that the Indiana property, which had been represented as cosmetic rehab only, had major structural issues and was not worth the $320,000 he had paid for it.

151.    In a text exchange with Mikosz on April 18, 2023, three weeks after Chase Real Estate had filed its appearance in the *Malik* case, Ger-Lih asked who the property manager was for the Butternut property.  Mikosz inadvertently disclosed that her affiliated management company, Defendant Mainstreet, was managing the property.  This was a gaffe because the seller was supposed to be an unaffiliated long-time owner.

152.    In response to Ger-Lih's query about management, Mikosz responded:

**Claudia?  Reach out to her first and she will guide you.**

(See Mikosz text message at Exhibit 18).

153.    Since Defendant Mainstreet was managing Ger-Lih's other properties (poorly as will be seen below) this confused him because Butternut was supposed to be owned by Mr. Carter and/or his Deodar entity.  Ger-Lih responded:

**Claudia also manages Butternut?  The seller also uses Mainstreet?**

(See text at Exhibit 18).

Mikosz responded untruthfully:

**Oh no sorry.  Not sure who they use (sic) I need to reach out to seller's and schedule  I mixed it with Evergreen (embarrassed smiley faces)  Can you share appraiser info so I can coordinate**

(See Exhibit 18).

154. Despite being named Defendants in the *Malik* matter, and being of record, and being aware of the allegations alleged against the Defendants, Defendant Chase Real Estate failed to properly supervise Mikosz and the fraudulent activities continued.

155. The Butternut transaction ultimately fell through in 2023.

156. At no time did Defendants Chase, Mikosz or Chojnacki disclose any conflict of interest.

157. At no time did Brenda disclose to Ger-Lih that Chase, Mikosz and Chojnacki were not working on his behalf, but on the behalf of themselves and their affiliated Defendants. Nor did she explain to Ger-Lih the fact that he was paying more than double the price paid by the Defendant Deodar for the Evergreen property at approximately the same time he had entered into the contract to purchase that same Evergreen property.

**Part III of the Fraud: The Renovations**

158. As indicated above, Defendant's fraudulent and deceptive practices continued after the closing of the transactions and into the renovations phase.

159. The fraud and deception came in the form of Defendant Mainstreet Management's property management, which concealed the true condition of the property, and fraudulent billing, and active concealment of the properties' condition.

160. The point of the purchases was to enable Plaintiff to either raise the rents (Indiana Evergreen) or quickly flip the properties and sell them at a profit once they had been renovated (Alsip, South Holland, and Elmwood Park). Mikosz told Ger-Lih that, in essence, they "do everything" with regard to the renovations.

161. The Defendant's property management and renovation period was a key step in the fraud-scheme because it enabled the Defendants to prevent the investor from discovering the

26

impostor bank scam and to prevent the investor from learning the poor condition of the properties.

162.    Plaintiff invested at least $125,000.00 for work that was either not performed or was performed inadequately so that the Plaintiff has not been able to resell as promised.

163.    Additionally, Defendant Mikosz failed to disclose a conflict of interest with respect to the work performed and the amounts paid by Plaintiff in that the work was performed by either FNBO Property Management LLC (FNBO), an entity owned and/or controlled by Mikosz's husband or Five Star Construction (Five Star) also owned by Miksoz's husband.

164.    As for FNBO, FNBO is not to be confused the major bank which uses that acronym, First National Bank of Omah.

165.    The principal office given for FNBO on its Illinois Secretary of State corporate filings is 2413 W. Algonquin Rd., Suite 219 Algonquin IL. 2413 West Algonquin Rd. is a UPS store.

166.    The manager of FNBO is Lukasz Mikosz, on information and belief the spouse of Defendant Mikosz.

167.    Defendants failed to disclose this conflict of interest.

168.    Defendants have treated other individuals or entities in the same illegal manner alleged by Plaintiff.  There are other known specific additional individuals and/or entities who were similarly defrauded by precisely or nearly precisely the same pattern of artifices and fraudulent misrepresentations as set forth in this Complaint.  As stated above, there are twelve other related cases pending in the Northern District of Illinois.

169.     The Defendants are, at present, continuing to lure investors into the enterprise using the same scheme and under the same guises as those set forth herein. Accordingly, the conduct alleged herein constitutes the Defendants' regular method of conducting their business.

## COUNT I:  RACKETEER INFLUENCED AND CORRUPT ORGANIZATION ACT (RICO) - 18 U.S.C. 1962(c), (d)

**(Defendants Chojnacki, Rixer, Mikosz, 1st Midwest Financial Inc., Long, Deodar, Kendall Murphy)**

Plaintiff re-state and re-allege Paragraphs 1 through 170 as though fully stated herein.

### RICO Persons

170.     Defendants Chojnacki, Rixer, Mikosz, 1st Midwest Financial Inc., Deodar, Long, TCF National, and Kendall Murphy, are each capable of holding a legal or beneficial interest in property, and therefore each is a "person" within the meaning of 18 U.S.C. § 1961(3).

### The Rico Enterprise

171.     Defendants Chojnacki, Rixer, Mikosz, 1st Midwest Financial Inc., Deodar, TCF National, Long, and Kendall Murphy, were associated in fact, and constituted an "enterprise" as that term is defined in Title 18, United States Code, Section 1961(4), which enterprise was engaged in, and the activities of which affected, interstate commerce. This enterprise shall be referred to herein as the "Flip Chicago and CitiPoint Enterprise,"

172.     The Flip Chicago and CitiPoint Enterprise constituted an ongoing organization whose members functioned as a continuing unit for a common purpose of achieving the objectives of the enterprise.

173.     The primary purpose of the Flip Chicago and CitiPoint Enterprise was to lure and then fleece unsuspecting real estate investors for the financial benefit of Flip Chicago and CitiPoint.

174.     For the purpose of 18 U.S.C. § 1962(c), and during the periods relevant to this complaint, said Defendants each had authority within the Flip Chicago and CitiPoint Enterprise, and/or conducted or participated, directly or indirectly, in the conduct of the Flip Chicago and CitiPoint Enterprise's affairs through the pattern of racketeering activity described herein.

## Effect on Interstate Commerce

175.     The Flip Chicago and CitiPoint Enterprise conducted its racketeering activity, in part, using the interstate mails and wire communications, including by use of the telephones, by electronic transfers of funds, and through the mailing of checks.

## Predicate Acts of Racketeering Activity

176.     Through the Flip Chicago and CitiPoint Enterprise, or in conspiracy with it, the Defendants conducted, engaged in, and participated in a pattern of racketeering activity, consisting, at a minimum, of the following predicate acts: (a) multiple violations of Title 18, United State Code, Sections § 1341, 1343, and 1346 (mail fraud and wire fraud).  The scheme to defraud was advanced, concealed or furthered by the use of the U.S. mail or wires.

177.     Specifically, the Defendants' predicate acts include, but are not limited to, the following:

    a)  In furtherance of a scheme or artifice to defraud as defined in 18 U.S.C. §§ 1341 & 1346, and with specific intent to defraud, Defendants placed ads on the Internet and on social media with the intent to induce investors to participate in "REO" real estate opportunities when they actually intended to sell the duped investor their own significantly marked-up property.

b) Engaging in a sustained fiction with the victim, replete with misrepresentations and calculated omissions to keep the investor misled that their transactional counterparty was an REO bank selling the property directly to the investor at REO level pricing.

c) Concealing and misrepresenting known property defects and significant building code and occupancy violations from the investor with the intent of inducing the investor to enter into the transaction.

d) Engaging in post-closing fraudulent activity in the management of the property by continued concealment of known property defects, building occupancy and code violations, and fraudulent billing relating to the renovation and flip.

e) In furtherance of a scheme or artifice to defraud as defined in 18 U.S.C. §§ 1341 & 1346, and with specific intent to defraud, Defendants placed ads on the Internet and on social media with the intent to induce investors to participate in "directly sourced" real estate opportunities when they actually intended to sell the duped investor their own significantly marked-up property.

f) Engaging in a sustained fiction with the victim, replete with misrepresentations and calculated omissions to keep the investor misled that their transactional counterparty was an old local landlord selling the property directly to the investor at bargain level pricing.

g) Fabricating occupancy records of the property to mislead the investor with the falsehood that that property was fully-leased and the tenant payments were fully current.

h) Concealing and misrepresenting known significant building code and occupancy violations from the investor with the intent of inducing the investor to enter into the transaction.

i) Engaging in post-closing fraudulent activity in the management of the property by 1) continued concealment of and falsification of rent records; 2) continued concealment of building occupancy and code violations.

**Pattern of Racketeering Activity**

178.    The Defendants acted, and conspired to act together, and in association with others knowingly and repeatedly committed the above fraudulent acts in furtherance of and for the purpose of enriching themselves financially and to otherwise further the ends of the Flip Chicago Enterprise.

179.    The predicate acts described above were related to one another as part of a common scheme or plan.

180.    Such unlawful conduct constituted a continuous pattern of racketeering activity beginning as early as July 2021, continue through the present, and are likely to continue into the foreseeable future.

## Conspiracy (18 U.S.C. § 1962(d))

### (Defendants Chase Real Estate, FNBO, Five Star, Rachel Irwin, Kathleen Long, Midwest Title, First National Financial, Inc., Lakeland Title, the Law Office of Brenda, and Brenda Murzyn)

181.    As described above, Chase Real Estate, FNBO, Rachel Irwin, Kathleen Long, First National Financial, Inc., Lakeland Title, and Brenda Murzyn, did knowingly agree to facilitate the Flip Chicago and CitiPoint Enterprise Defendants, and those acting in concert with them, to violate 18 U.S.C. § 1962(c) for the purpose of achieving and profiting from the racketeering activities described above.

182.    In furtherance of that agreement, the said Defendants knowingly and intentionally agreed and conspired to commit at least two of the predicate acts set forth above and they did so with the knowledge and intent that such acts were in furtherance of the foregoing pattern of racketeering.

183.    Specifically, the Defendants described herein were either affiliated or controlled by the Flip Chicago and CitiPoint Enterprise Defendants

184.    The Defendants described herein knowingly provided auxiliary services with respect to the marketing, negotiation, and transaction of real estate closing services which were necessary to and facilitated the accomplishment of the goals of the Flip Chicago Enterprise.

31

185.    Defendant Chase Real Estate LLC provided the cover of a legitimate real estate brokerage enterprise, oversaw the conduct and behavior of Mikosz and Chojnacki, and received a commission from 1st Midwest Financial, Inc. (the seller) notwithstanding the fact that at all relevant times herein, they held themselves out as Ger-Lih's agent.

186.    Defendant Lakeland Title provided the cover of a legitimate real estate title company, oversaw the conduct and behavior of Irwin, as seller's title agent, received closing, settlement and escrow title fees from 1st Midwest Financial and Plaintiff, coordinated the title search, title report, chain of title, and issuing of the title commitment, did not notify Plaintiff of 1st Midwest Financial's failure to comply with title transfer and building code requirements, and allowed Elmwood Park, South Holland, and Alsip closings to occur despite the fact that 1st Midwest was not the owner of record at the time of either closing and despite the fact that Seller had not complied with required building and/or transfer requirements.

187.    As part of the Flip Chicago and Citipoint Scheme, Defendant Brenda, individually and as an attorney with the Law Offices of Brenda Murzyn, also at times represented "investor buyers" as buyer's attorney in Chase Real Estate transactions, further facilitating the fraud regarding the true owners of the subject transactions.

188.    Brenda, and the Law Office of Brenda, also represented Ger-Lih in the Indiana Evergreen transaction, despite not being licensed to do so, and prevented him from learning of the secret purchase by Defendants of the Indiana Evergreen property from Mr. Carter.

**Injuries to the Plaintiff Business and Property**

189.    As a direct and proximate cause of the described racketeering activities and violations of 18 U.S.C. § 1962(c), and the described conspiracy in violation of 18 U.S.C. § 1962(d), Plaintiff have been injured in their business and property. The Defendants' racketeering

activities caused Plaintiff to invest $327,000 in real estate which the Defendants had actual knowledge was worth far less and said racketeering activities directly resulted and were the proximate cause of Plaintiff' loss of invested funds. Plaintiff also spent in excess of $85,000 in renovation costs for work that was either not performed or not performed properly.

190.    The Defendants' racketeering activities further caused Plaintiff substantial damages due to the fact that the Properties required far more significant repairs at a far greater expense to Plaintiff than had been previously disclosed to them.

191.    These injuries were a foreseeable consequence of the Defendants' racketeering activities and violations of 18 U.S.C. § 1962(c), and their conspiracy in furtherance of those racketeering violations, in violation of 18 U.S.C. § 1962(d).

**WHEREFORE**, Plaintiff GER-LIH LIN, respectfully requests the Court to enter judgment in his favor and against each of the Flip Chicago and CitiPoint Enterprise Defendants and their conspirators and order the following relief:

(a) All damages proven pursuant to RICO, trebled as permitted by law;

(b) Punitive damages, attorney fees, and costs as permitted by law; and

(c) Such other and further relief as the Court may deem just and appropriate.

## COUNT II: COMMON LAW FRAUD

192.    Plaintiff restate Paragraphs 1 through 191 as if fully set forth herein.

193.    Defendant Mikosz and Chojnacki's statements set forth above concerning the sellers of the properties being "REO" banks, the purchase price being a "discount" and/or "REO" price, the condition of the Properties, and their status, were false statements of material fact.

194.    Defendants Mikosz and Chojnacki made the statements with knowledge that they were false.

195.    Defendants Mikosz and Chojnacki made the false statements with the intention to induce Plaintiff to purchase the Subject Properties under falsified premises.

196.    Plaintiff reasonably and justifiably relied on the said Defendants' false statements.

197.    Plaintiff suffered damages due to reliance on the false statements.

198.    Accordingly, the Defendants' statements, Plaintiff' reliance thereon, and resulting damages constitute common law fraud.

WHEREFORE, Plaintiff, GER-LIH LIN prays that this Honorable Court enter judgment in his favor and against Defendants in an amount in excess of the jurisdictional limit of Seventy-Five Thousand Dollars ($75,000.00), plus his costs of suit, attorneys' fees, and such other relief as this Court deems just and equitable.

## COUNT III: VIOLATION OF THE ILLINOIS CONSUMER FRAUD AND DECEPTIVE BUSINESS PRACTICES ACT (ILLINOIS CONSUMER FRAUD ACT)

199.    Plaintiff re-state Paragraphs 1 through 198 above as if fully set forth herein.

200.    Defendants Mikosz and Chojnacki's statements, including but not limited to their statements set forth above concerning the various properties, their "REO" or "bank sold" status, the sellers being "REO" or "bank" sellers, the properties' condition, and the alleged work performed that was either not performed or was performed inadequately and/or not up to code, were false statements of material fact and constituted a deceptive act or practice by the said Defendants.

201.    Defendants Mikosz and Chojnacki intended that Plaintiff rely on the deception.

202.    The occurrence of the deception was in the course of conduct involving trade and commerce.

203.     The deceptions were originated by residents of Illinois, concern Illinois real estate, and have resulted in violations of Illinois municipal laws.  Accordingly, the conduct alleged herein directly and indirectly affects the State of Illinois.

204.     The deception was the proximate cause of actual damage to Plaintiff.

205.     Accordingly, the conduct of deception perpetrated by Defendants Mikosz and Chojnacki constitutes a violation of the Illinois Consumer Fraud and Deceptive Business Practices Act.

WHEREFORE, Plaintiff GER-LIH LIN, prays that this Honorable Court enter judgment in their favor and against Defendants in an amount in excess of the jurisdictional limit of Seventy-Five Thousand Dollars ($75,000.00), plus their costs of suit, attorneys' fees, and such other relief as this Court deems just and equitable.

## COUNT IV: VIOLATION OF THE ILLINOIS REAL ESTATE LICENSE ACT

206.     Plaintiff re-state Paragraphs 1 through 205 above as if fully set forth herein.

207.     Defendants Mikosz and Chojnacki provided real estate services in this transaction as agents of Chase Real Estate LLC.

208.     Defendants Mikosz, Chojnacki and Chase Real Estate LLC were "Licensees" under the Real Estate License Act, 225 ILCS 454/1-1 *et seq.*

209.     Section 15-25 of the Real Estate License Act mandates that:

> Licensees shall treat all customers honestly and shall not negligently or knowingly give them false information.

210.     Section 15-5 of the Real Estate License Act specifies that:

> This Article 15 may serve as a basis for private rights of action and defenses by sellers, buyers, landlords, tenants, real estate brokers, and real estate salespersons.

35

211.    Defendants Mikosz, Chojnacki and Chase Real Estate LLC breached the requirements of the Real Estate License Act by committing the following actions:

    a)  fraudulently misrepresenting that they represented the Plaintiff as buyer when in actuality they represented, were affiliates of and/or were direct agents of the seller;

    b)  fraudulently misstating the condition of the Property;

    c)  fraudulently misstating the tenancy of the Property;

    d)  fraudulent falsification of the purported rent roll;

    e)  fraudulently misrepresenting to the Plaintiff that the seller in the transaction was a directly sourced, off-market seller when in truth the Seller was comprised of, directly affiliated with or controlled by the Defendants themselves or were agents thereof;

    f)  negligently misrepresenting all the above (a) through (e) to the Plaintiff.

212.    Plaintiff relied on Defendants Mikosz, Chojnacki and Chase Real Estate LLC's statements and suffered damages therefrom.

WHEREFORE, Plaintiff GER-LIH LIN, prays that this Honorable Court enter judgment in his favor and against Defendants in an amount in excess of the jurisdictional limit of Seventy-Five Thousand Dollars ($75,000.00), plus their costs of suit, attorneys' fees, and such other relief as this Court deems just and equitable.

## COUNT V:  NEGLIGENT MISREPRESENTATION

213.    Plaintiff re-state Paragraphs 1 through 212 above as if fully set forth herein.

214.    Defendants Mikosz and Chojnacki's statements, including but not limited to their statements set forth above concerning the various properties, their "REO" or "bank sold" status, the "REO" or "bank" sellers, the properties' condition, their statements regarding the work that was either not performed and/or performed inadequately and/or not up to code, were false statements of material fact, and/or careless statements.

36

215.    Defendants Mikosz and Chojnacki made the false and/or careless statements through carelessness or negligence in ascertaining the truth of the statement by the party making it.

216.    Defendants Mikosz and Chojnacki's false and/or careless statements were made with intention to induce Plaintiff to act.

217.    Plaintiff' actions in consummating the transaction were in reliance on the false and/or careless statements.

218.    Plaintiff' reliance was the proximate cause of damage to them.

219.    Defendants Mikosz and Chojnacki's statements therefore constitute Negligent Representation.

WHEREFORE, Plaintiff GER-LIH LIN, prays that this Honorable Court enter judgment in their favor and against DEFENDANTS in an amount in excess of the jurisdictional limit of Seventy-Five Thousand Dollars ($75,000.00), plus their costs of suit, attorneys' fees, and such other relief as this Court deems just and equitable.

## COUNT VI: UNJUST ENRICHMENT

220.    Plaintiff reallege and incorporate by reference herein the allegations of Paragraphs 1-219 of this Complaint, as if fully set forth herein.

221.    Defendants did conspire and collude in the undertaking to mislead Plaintiff into believing they would be acquiring investment property directly from a long-time seller or an REO bank.

222.    Plaintiff believed and relied on Defendants' scheme of misleading statements and conduct when he agreed to buy the Properties from Defendants, who had secretly already

purchased the Properties directly from REO bank or the local landlord for less than the amount that they fraudulently induced Plaintiff to pay.

223.    Further, Plaintiff paid Defendants great sums of money to renovate the subject properties in order to flip them in a timely manner.  The work was either not performed and/or was not performed adequately.  Plaintiff have not been able to flip the properties a year later.

224.    The direct and proximate cause of the Defendants was to deprive the Plaintiff of the fair bargain they had promised them.

225.    As a consequence of receiving and retaining the difference between the REO price or the off market private seller price and the fraudulently contrived price and receiving funds from Plaintiff and either not performing the work or not performing the work adequately, the Defendants have unjustly retained a benefit to the Plaintiff' detriment, and Defendants' retention of the benefit violates the fundamental principles of justice, equity, and good conscience.

WHEREFORE, Plaintiff GER-LIH LIN, respectfully requests the Court to enter judgment in his favor and against each of Defendants and order the following relief:

a) Payment to the Plaintiff of the benefit that they received as a consequence of their fraudulent misrepresentations being the difference between the purchase price of the Property paid by Plaintiff and that paid by themselves or such other amount to be proven at trial;

b) Return of funds paid by Plaintiff for renovation of the properties;

c) Punitive damages, attorney fees, and costs as permitted by law; and

d) Such other and further relief as the Court may deem just and appropriate.

Respectfully Submitted,

/s/Carmen Gaspero

_____

/s/Lisa Gaspero

_____

Ger-Lih Lin
By: His Counsel


Gaspero & Gaspero
Attorneys at Law, P.C.
Carmen A. Gaspero
Lisa M. Gaspero
2001 Butterfield Rd., Suite 1022
Downers Grove, Illinois 60515
630-687-9700