UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| GER-LIH LIN, | ) | |
| | ) | |
| *Plaintiff*, | ) | |
| v. | ) | No. 24 C 3725 |
| | ) | |
| MARCIN CHOJNACKI, et al., | ) | Chief Judge Virginia M. Kendall |
| | ) | |
| *Defendants*. | ) | |
| | ) | |

**OPINION AND ORDER**

Plaintiff Ger-Lih Lin alleges that Defendants[1] conducted a fraudulent real estate scheme by tricking Plaintiffs into purchasing real estate through a series of misrepresentations about the property. Pending before the Court is Defendant Robert Rixer's Motion to Dismiss Counts I and VI of Plaintiff's Complaint. (Dkt. 4). For the reasons below, the Court denies Rixer's Motion to Dismiss [105].

**BACKGROUND**

Plaintiff Ger-Lih "Tony" Lin is a California resident and young working professional who wanted to invest in real estate. (Dkt. 4 ¶¶ 1, 39). In July 2021, Lin responded to a social media advertisement for CitiPoint Properties ("CitiPoint"), which held itself out as a real estate investment firm that connects investors with the owners of undervalued " 'off-market' properties"

---

[1] Defendants include the following natural persons and businesses: Marcin Chojnacki, Kendall Murphy, Robert Rixer, FNBO Property Management LLC, Kathleen Long, Rachel Irwin, Chase Real Estate, LLC; Citypoint Illinois LLC; Deordar, Evergreen, Butternut EC LLC; TCF National Holdings, Inc.; 1st Midwest Financial, Inc., Five Star Construction Services LLC; First National Financial Inc.; Mainstreet Property Management; EJ Investment Group, Inc.; Midwest Title and Closing Services LLC; BLM Title Services, LLC (doing business as Lakeland Title Services). (Dkt. 4). The Court approved the parties' settlement as to Defendants Brenda Murzyn and the Law Office of Brenda Murzyn, P.C. on April 17, 2025, but the Plaintiffs have not yet filed a notice of voluntary dismissal. (Dkt. 126).

1

and thereby offered investors the opportunity to purchase " 'directly sourced' properties." (*Id.* at ¶ 40). The advertisement promised "rapidly increasing equity and high cash flow." (*Id.* at ¶ 40). CitiPoint's website lists Defendants Marcin Chojnacki and Rixer as CitiPoint's managing directors and Lori Mikosz[2] as a member of the investment sales team. (Dkt. 4-4 at 1–2, Screenshot of CitiPoint Website). In addition to their roles at CitiPoint, both Mikosz and Chojnacki worked at Chase Real Estate as real estate agents. (Dkt. 4-3 at 1–3, Screenshot of Chase Real Estate Website).

Mikosz, a CitiPoint investment sales representative, responded when Lin inquired about CitiPoint's offerings, and the two engaged in "sustained email, phone[,] and Zoom meeting interaction . . . . " (Dkt. 4 at ¶ 41; *see, e.g.*, Dkt. 4-8 at 1–2, Example Emails Between Lin and Mikosz). Mikosz told Lin that she was a real estate broker at Defendant Chase Real Estate LLC and that "because 'CitiPoint' is the same company as Chase Real Estate, that the transactions would be safely negotiated and consummated under the auspices of Chase Real Estate." (Dkt. 4 at ¶¶ 42–43). Mikosz informed Lin that Chojnacki was Mikosz's managing broker at Chase Real Estate. (*Id.* at ¶ 43). Mikosz explained to Lin that "her company reaches out to building owners – mostly struggling local landlords – to learn if they are interested in selling their properties and then introduces their properties to the investors." (*Id.* at ¶ 46). Mikosz told Lin that the self-managed nature of these properties meant they were underperforming their economic potential, but that with professional management, an investor could unlock greater returns than a local landlord ever could. (*Id.* at ¶¶ 47–49). Mikosz explained to Lin that, with the help of the affiliated property management company Defendant Mainstreet Property Management, a new owner could expect substantial cash flow from a property that previously struggled financially. (*Id.* at ¶¶ 47–49).

---

[2] Claims against Defendant Laurena "Lori" Mikosz were dismissed with prejudice on August 27, 2025, pursuant to the parties' settlement and stipulation of dismissal. (*Malik et al v. Prairie Raynor LLC et al*, No. 1:23-cv-01182, Dkt. 306; *see also* Dkts. 305, 307).

Mainstreet Property Management, now a terminated Illinois limited liability company, was owned by Defendant EJ Investment Group Inc., which is owned and controlled by Rixer and Chojnacki. (*Id.* at ¶ 19–21). Rixer, Chojnacki, Mikosz, and other Defendants operated out of the same office. (*Id.* at ¶ 29).

Mikosz sent Lin offers for multi-family properties under the "CitiPoint" name as well as offers for single-family properties under the "Flip Chicago" name. (*Id.* at ¶¶ 50–52). Flip Chicago held itself out as a real estate investment company connecting out-of-state investors with Illinois real estate. (*Id.* at ¶ 24). Chojnacki worked as the managing broker at Flip Chicago, with Mikosz listed as a real estate broker. (Dkt. 4-5 at 1, Screenshot of Flip Chicago Website). Mikosz told Lin that Flip Chicago deals could be renovated and ready for resale within three months of closing with the help of Chase Real Estate's recommended home flipping experts. (Dkt. 4 at ¶¶ 53–56). Mikosz told Lin that the single-family homes in the deals she presented were Real Estate Owned (REO) properties—foreclosed properties owned by banks that failed to sell at auction—that Lin could purchase at significantly discounted prices. (*Id.* at ¶¶ 62–68).

In all relevant transactions, though, the "bank" offering the allegedly foreclosed properties was not a real bank but Defendant 1st Midwest Financial, Inc., an Illinois corporation operated by an affiliate of Mikosz and Chojnacki, Defendant Kendall Murphy. (*Id.* at ¶¶ 5, 6, 69). Lin alleges that 1st Midwest Financial—which lacks financial service credentials and a legitimate address, and has no affiliation with the widely known First Midwest Bank—was deceptively named to support the false representation that Flip Chicago's available listings were bank-owned REO properties being sold at a significant discount. (*Id.* at ¶¶ 70–79).

Lin ultimately purchased four properties from Defendants, believing three to come from 1st Midwest Financial's REO holdings and the fourth, the Indiana Property, to come directly from a private landlord. (*Id.* at ¶¶ 145, 146). The four properties are as follows:

- 3934 Evergreen St., East Chicago, Indiana ("Indiana Property"): purchased with the goal of raising rents. (*Id.* at ¶¶ 112, 145, 160).

- 11825 Springfield Ave., Alsip ("Springfield Avenue Property"): purchased with the goal to renovate, or "flip," the property, and sell at a profit. (*Id.* at ¶¶ 81, 145, 160).

- Elmwood Park Property: purchased with the goal to renovate, or "flip," the property, and sell at a profit. (*Id.* at ¶¶ 145, 160).

- South Holland Property: purchased with the goal to renovate, or "flip," the property, and sell at a profit. (*Id.* at ¶¶ 145, 160).

Lin's Complaint focuses on the Indiana Property and Springfield Avenue Property transactions.

Indiana Property:

Mikosz recommended the Indiana Property to Lin as one of the investment opportunities Chase Real Estate secures through its negotiations with private landlords—here, a Bernard Carter. (*Id.* at ¶¶ 112–115). Mikosz told Lin that if Lin raised rents to market rates and refinanced the property at a higher building value, Lin would be able to pay off the purchase price and quickly start to turn a profit on the Indiana Property. (*Id.* at ¶¶ 115–117). Mikosz assured Lin that the property did not need renovations. (*Id.* at ¶ 116). Lin believed he was purchasing the building directly from Carter, but Lin's August 5, 2021, purchase agreement to acquire the building for $320,000 identified Defendant Deordar, Evergreen, Butternut EC LLC ("Deodar") as the seller. (*Id.* at ¶¶ 117–118, 127). Mikosz represented that Deodar was in fact Carter's own LLC, which

4

Lin believed to be true. (*Id.* at ¶¶ 123–127). Further, Lin received a title commitment identifying Bernard Carter as the owner. (*Id.* at ¶¶ 123–127). In fact, Defendant Deodar did not yet own the building, but only acquired the property from Carter until October 25, 2021, for a purchase price of $150,000. (*Id.* at ¶¶ 117–118, 127, 140). Lakeland Title acted as escrow agent for the out-of-state transaction. (*Id.* at ¶ 121). Murzyn, Lakeland Title's owner and manager, also served as Lin's attorney in the Indiana Property transaction at Mikosz's recommendation, despite Murzyn's lack of license to practice law in Indiana. (*Id.* at ¶¶ 122, 133–134).

After some delays in closing relating to unanticipated rehab and financing complications, Mikosz provided Lin with a new lender for the Indiana Property and said that a new purchase agreement would be required. (*Id.* at ¶¶ 130–136). On June 10, 2022, Lin signed a new purchase agreement; however, the agreement now identified TCF National Holdings, not Deodar, as the seller. (*Id.* at ¶ 136). Mikosz again explained this change as a product of business restructuring on Carter's part. (*Id.* at ¶ 138). Lin closed on the Indiana Property on October 17, 2022. (*Id.* at ¶ 139). In line with Mikosz's initial offer of Chase Real Estate's services, Lin utilized the recommended Defendant Mainstreet Property Management as a property manager for the Indiana Property, despite Mainstreet's lack of license to manage properties in Indiana. (*Id.* at ¶ 143).

Springfield Avenue Property:

Mikosz sent Lin a recommendation to purchase the Springfield Avenue Property on March 1, 2022, describing the property as an REO with 1st Midwest Financial as the foreclosing bank throughout the transaction (*Id.* at ¶¶ 82, 85). On March 9, 2022, Lin contracted to purchase the property from 1st Midwest Financial for $195,000, with Chase Real Estate and Mikosz listed as the buyer's designated brokerage and agent. (*Id.* at ¶ 87). The deal closed on May 31, 2022. (*Id.* at ¶ 88). Unbeknownst to Lin, the property was not a foreclosure, and Defendants had actually

purchased the property from private parties for $181,500 on March 2, 2022. (*Id.* at ¶ 90). Lakeland Title, owned and managed by Brenda Murzyn, facilitated the title commitment for Lin, which backdated the chain of title to February 1, 2022, and did not reveal the March 2, 2022, sale. (*Id.* at ¶¶ 26, 91–95; Dkt. 4-10 at 4).

Renovations Process

At Mikosz's recommendation, Lin utilized Mainstreet Property Management's services. (*Id.* at ¶¶ 159–161). Lin invested at least $125,000 into work that was not performed or was inadequately performed during the property management and renovation period. (*Id.* at ¶¶ 161–162). Lin alleges that Mikosz did not disclose that her spouse owns two of the contractors who performed Lin's renovations. (*Id.* at ¶¶ 163, 166). Lin invested at least $125,000.00 for renovations work that was either not performed or was performed inadequately so that the Plaintiff has not been able to resell as promised. (*Id.* at ¶ 162).

Lin filed this suit on May 7, 2024. (Dkt. 1). In Count I of the Complaint, Plaintiff alleges violations of the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. §§ 1962(c), (d). (*Id.* at ¶¶ 170–191). Count II is a common-law fraud claim against Mikosz and Chojnacki. (*Id.* at ¶¶ 192–198). Count III alleges that Mikosz and Chojnacki violated the Illinois Consumer Fraud and Deceptive Business Practices Act (ICFA), 815 ILCS 505/1 *et seq*. (*Id*. at ¶¶ 199–205). Count IV alleges Mikosz, Chojnacki, and Chase Real Estate violated the Illinois Real Estate License Act (IRELA), 225 ILCS 454/1 *et seq*. (*Id.* at ¶¶ 206–212). Count V brings a negligent misrepresentation claim against Mikosz and Chojnacki. (*Id.* at ¶¶ 213–219). Last, Count VI brings an unjust enrichment claim against all Defendants. (*Id.* at ¶¶ 220–225).

**LEGAL STANDARD**

To survive a 12(b)(6) motion to dismiss for failure to state a claim, the complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." *Russell v. Zimmer, Inc.*, 82 F.4th 564, 570 (7th Cir. 2023) (quoting Fed. R. Civ. P. 8(a)(2)). Thus, "a plaintiff must allege 'enough facts to state a claim that is plausible on its face.' " *Allen v. Brown Advisory, LLC*, 41 F.4th 843, 850 (7th Cir. 2022) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (quoting *Ashcroft v. Iqbal*, 566 U.S. 662, 678 (2009)). The Court accepts the well-pleaded factual allegations in the plaintiff's complaint as true, "drawing all reasonable inferences in his favor." *Id.* (citing *W. Bend Mut. Ins. Co. v. Schumacher*, 844 F.3d 670, 675 (7th Cir. 2016)). Yet, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements[,]" are not enough. *Oakland Police & Fire Ret. Sys. v. Mayer Brown, LLP*, 861 F.3d 644, 649 (7th Cir. 2017) (quoting *Iqbal*, 556 U.S. at 678). The complaint's factual content must "raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555.

For claims sounding in fraud, Federal Rule of Civil Procedure 9(b) requires plaintiffs to "state with particularly the circumstances constituting fraud." Fed. R. Civ. P. 9(b). Thus, a plaintiff must "describe the 'who, what, when, where, and how' of the fraud—'the first paragraph of any newspaper story.' " *United States ex rel. Presser v. Acacia Mental Health Clinic, LLC*, 836 F.3d 770, 776 (7th Cir. 2016) (quoting *United States ex rel. Lusby v. Rolls-Royce Corp.*, 570 F.3d 849, 853 (7th Cir. 2009)).

**DISCUSSION**

In Count One, Plaintiff asserts that Defendants, including Rixer, violated 18 U.S.C. § 1962(c).[3] (Compl., Dkt. 4 ¶¶ 170–180). Under § 1962(c), it is "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." 18 U.S.C. § 1962(c).

To state a claim under § 1962(c), a plaintiff must allege: "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Sabrina Roppo v. Travelers Com. Ins. Co.*, 869 F.3d 568, 587–88 (7th Cir. 2017). Before diving into the RICO allegations, it is worth noting that the complaints in the related cases pending before this Court—all describing the same RICO conspiracy and RICO enterprise comprised of the same or similar defendants[4]—give Plaintiffs' claims a marginal plausibility boost. *See Pirelli Armstrong Tire Corp. Retiree Med. Benefits Tr. v. Walgreen Co.*, 631 F.3d 436, 443 (7th Cir. 2011) ("It is appropriate to accord limited corroborative weight to allegations in another's lawsuit.").

Rixer contends that Plaintiff fails to state a claim under § 1962(c), because the Amended Complaint does not describe how Rixer committed two predicate acts, as required to satisfy the "pattern of racketeering activity" element. (Dkt. 105 at 1). The Court, however, concludes that Plaintiff sufficiently pleads at least two predicate acts of wire fraud.

A pattern of racketeering activity requires the completion of at least two predicate acts within ten years. *Bible v. U.S. Aid Funds, Inc.*, 799 F.3d 633, 659 (7th Cir. 2015); 18 U.S.C. § 1961(5). The two violations "must exhibit continuity plus relationship. Related predicate acts have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise

---

[3] Plaintiff does not allege that Rixer engaged in a RICO conspiracy under § 1962(d). (Dkt. 4 ¶ 181).
[4] *See, e.g.*, Am. Complaint, *Malik v. Prairie Rainor LLC*, No. 23-cv-01182, Dkt. 5.

are interrelated by distinguishing characteristics and are not isolated events." *Sabrina*, 869 F.3d at 589 (quoting *Empress Casino Joliet Corp. v. Balmoral Racing Club, Inc.*, 831 F.3d 815, 828 (7th Cir. 2016)) (citation modified); *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 239 (1989). Continuity "limits RICO to schemes meant to exist over a period of time, not one-off crimes." *Empress*, 831 F.3d at 828. While Rixer does not challenge Lin's satisfaction of the relationship-plus-continuity test, Rixer argues that Lin has failed to adequately plead predicate acts. (Dkt. 105 at 3–4).

As predicate acts, Stafford alleges mail and wire fraud in violation of 18 U.S.C. §§ 1341 and 1343. (Dkt. 4 ¶¶ 176–177). "The elements of mail fraud are: (1) the defendant's participation in a scheme to defraud; (2) defendant's commission of the act with intent to defraud; and (3) use of the mails in furtherance of the fraudulent scheme." *Bible*, 799 F.3d at 657 (quoting *Williams v. Aztar Ind. Gaming Corp.*, 351 F.3d 294, 298–99 (7th Cir. 2003)) (citation modified); 18 U.S.C. § 1341. Wire fraud has the same elements, except that the defendant must use interstate wires instead of mail to further the scheme. *Bible*, 799 F.3d at 657 (citing *United States v. Green*, 648 F.3d 569, 577–78 (7th Cir. 2011)); 18 U.S.C. § 1343.

Lin's allegations of mail and wire fraud are subject to Rule 9(b)'s particularity requirement. *See Bible*, 799 F.3d at 658; Fed. R. Civ. P. 9(b). At a minimum, therefore, Lin must "describe the two predicate acts of fraud with some specificity and state the time, place, and content of the alleged false representations, the method by which the misrepresentations were communicated, and the identities of the parties to those misrepresentations." *Bible*, 799 F.3d at 658 (quoting *Slaney v. Int'l Amateur Athletic Fed'n*, 244 F.3d 580, 597 (7th Cir. 2001)). Yet, Rule 9(b) does not demand "form for form's sake . . . . [A]lthough plaintiffs are not absolutely required to plead the specific date, place, or time of the fraudulent acts, they still must use some alternative means of injecting precision and some measure of substantiation into their allegations of fraud." *Pirelli*, 631 F.3d at

9

442 (citation omitted). The requisite level of detail may vary from case to case. *Id.* (citing *Emery v. Am. Gen. Fin., Inc.*, 134 F.3d 1321, 1324 (7th Cir. 1998)). Since "fair notice is the 'most basic consideration underlying Rule 9(b),'" in a case involving multiple defendants, 'the complaint should inform each defendant of the nature of his alleged participation in the fraud.'" *Rocha v. Rudd*, 826 F.3d 905, 911 (7th Cir. 2016) (quoting *Vicom, Inc. v. Harbridge Merch. Servs.*, 20 F.3d 771, 777–78 (7th Cir. 1994)).

Lin alleges that "Defendants placed ads on the Internet and on social media with the intent to induce investors to participate in 'REO' real estate opportunities" as well as " 'directly sourced' real estate opportunities." (Dkt. 4 ¶¶ 177(a), 177(e)). Yet, Defendants "actually intended to sell the duped investor their own significantly marked-up property." (*Id.*) For the three property purchases Lin believed to be coming from 1st Midwest Financial's REO holdings, Lin alleges further that Defendants engaged in a "sustained fiction," "replete with misrepresentations and calculated omissions" to mislead Lin into believing that his "transactional counterparty was an REO bank selling the property directly to [Lin] at REO level pricing." (*Id.* at ¶¶ 145, 177(b)). Lin alleges similar misconduct with regard to the Indiana Property, where Defendants misled Lin to believe his "transactional counterparty was an old local landlord selling the property directly to the investor at bargain level pricing." (*Id.* at ¶ 177(f)).

The larger project of "[c]oncealing and misrepresenting known property defects and significant building code and occupancy violations," Lin alleges, was aimed at "inducing the investor to enter into the transaction." (*Id.* at ¶¶ 177(c), 177(h)). With regard to the tenant-occupied property, Lin alleges that Defendants fabricated occupancy records "to mislead the investor with the falsehood that that property was fully-leased and the tenant payments were fully current." (*Id.* at ¶ 177(g)). Finally, Lin alleges "post-closing fraudulent activity in the management of the

10

property by continued concealment of known property defects, building occupancy and code violations, and fraudulent billing relating to the renovation and flip," as well as other undisclosed rental and regulatory violations. (*Id.* at ¶ 177(d), 177(i)).

While some of these allegations lump Defendants together, notably, entities allegedly owned and controlled by Defendant Rixer were involved throughout Lin's transactions with the various Defendants. As noted above, Rixer is listed as a managing director of CitiPoint, a real estate agent at Chase Real Estate, and the owner and controller of Mainstreet Property Management via a parent company, Defendant EJ Investment Group Inc. (*Id.* at ¶ 19–21; Dkt. 4-3 at 1–3; Dkt. 4-4 at 1). Rixer operated out of the same office as other key defendants, including Chojnacki and Mikosz. (Dkt. 4 ¶ 29). Considering Rixer's upper-level involvement with the various entities, it is plausible to infer that he contributed to the scheme with fraudulent intent.

Lin's well-pleaded allegations add up to at least two plausible instances of wire fraud—a sufficient pattern of racketeering activity. *See Empress*, 831 F.3d at 827 ("Each use of the wires can be an individual count of wire fraud and an individual RICO predicate for the purpose of establishing two predicate acts."). Those acts are sufficiently attributable to Rixer, because Lin plausibly alleges that Rixer knowingly participated in the asserted scheme to defraud by purchasing and reselling several properties to Lin in coordination with the other Defendants. That is especially true as to Rixer's purported agent Mikosz, who directly used the wires to communicate the misrepresentations, from which the predicate acts of wire fraud arise, in furtherance of the scheme to defraud. *United States v. Powell*, 576 F.3d 482, 490 (7th Cir. 2009); *United States v. Jackson*, 546 F.3d 801, 815–16 (7th Cir. 2008) ("Even so, co-schemers are jointly responsible for one another's acts in furtherance of the scheme; so upon finding that Joe was a knowing participant in the scheme, the jury was free to hold him to account for any fraudulent

11

misrepresentations that were made by Essie and/or Angela after he joined the scheme."); *United States v. Sheneman*, 682 F.3d 623, 630 (7th Cir. 2012) ("[T]here is no requirement that a defendant personally cause the use of the wire. Rather, it will suffice if the use of the wire 'will follow in the ordinary course of business, or where such use can be reasonably foreseen, even though not actually intended.' "); *United States v. Adeniji*, 221 F.3d 1020, 1026 (7th Cir. 2000).

Plaintiff thus states a plausible RICO claim under § 1962(c) (Count I). And because, as Rixer argues, Plaintiff's unjust enrichment claim (Count VI) turns on the RICO claim, Plaintiff also states a plausible claim of unjust enrichment. Accordingly, the Court denies Rixer's Motion to Dismiss. (Dkt. 105).

## CONCLUSION

For the reasons above, the Court denies Rixer's Motion to Dismiss [105].

_____
Virginia M. Kendall
United States District Judge

Date: September 24, 2025

12