**THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| GER-LIH LIN, | ) | |
| | ) | |
| *Plaintiff*, | ) | No. 24 C 3725 |
| v. | ) | |
| | ) | Chief Judge Virginia M. Kendall |
| MARCIN CHOJNACKI, *et al*., | ) | |
| | ) | |
| *Defendants*. | ) | |

**MEMORANDUM OPINION & ORDER**

Out-of-state resident Ger-Lih "Tony" Lin brought a complaint alleging violations of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1962(c), (d), and various state-law claims. (Dkt. 4). It is one of 15[1] related cases, all in front of this Court, that Plaintiffs' attorneys have brought alleging that various overlapping Defendants engaged in a fraudulent real-estate investment scheme. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and 18 U.S.C. § 1964(c).

Over the course of the litigation, numerous defendants settled in all of the related cases. Nonetheless, three separate sets of Defendants filed motions for summary judgment against Plaintiffs: Defendants Kendall Murphy and 1st Midwest Financial, Inc ("Murphy Defendants") (Dkt. 173); Defendants First National Financial, Inc. (FNF) and Kathleen Long ("Long Defendants") (Dkt. 171); and Defendant Marcin Chojnacki along with related entities[2] (Chojnacki Defendants) (Dkt. 175).

---

[1] There were as many as 16 related cases, but one, *Ascot Specialty Insurance Company, A Rhode Island Corporation v. Midwest Title & Closing Services LLC et al*, 1:24-cv-05216, settled and closed on December 4, 2025.

[2] Marcin Chojnacki and the following entities: include the following natural persons and entities, only some of whom have been named in this case: Marcin Chojnacki, Robert Rixer, and the following entities: City point Illinois LLC; Deodar, Evergreen, & Butternut EC LLC; EJ Investment Group, Inc.; Mainstreet Property Management LLC; and TCF National Holdings, Inc. (Dkt. 176).

In this case, Plaintiffs' Amended Complaint alleged that the Chojnacki Defendants, the Murphy Defendants, and Long individually violated 18 U.S.C.§ 1962(c), (d), (Dkt. 4 ¶¶ 170–180), while FNF violated just § 1962(d), (*id.* at ¶¶ 181–191).

For the below reasons, the Chojnacki Defendants' Motion for Summary Judgment (Dkt. 175), the Long Defendants' Motion (Dkt. 171) and the Murphy Defendants' Motion (Dkt. 173) are granted in part and denied in part. The Motions are granted with regard to Plaintiff's attempt to proceed under 18 U.S.C. § 1964 on a theory of speculative profit loss; they are otherwise denied as to the RICO claims, which remain in the case in accordance with the analysis herein. Further, the Long Defendants' Motion is granted in full as applied to FNF's liability (but not Long herself). The Court also grants the Murphy Defendants' and the Long Defendants' Motion on Count VI for Unjust Enrichment. The Court grants the Chojnacki Defendants' Motion with regard to common-law fraud (Count II); violation of the IRELA (Count IV); and negligent misrepresentation (Count V); it denies the motion as to violation of the ICFA (Count III) and the follow-on claim of unjust enrichment (specifically for the Chojnacki Defendants) (Count VI), which remain in the case and will proceed to trial unless the parties can reach a settlement.

## BACKGROUND

Related cases in this litigation have already made clear the shortcomings of the present record. To summarize some of the most pertinent issues discussed therein: Plaintiffs' attorneys regularly inserted entire paragraphs worth of fact into their 56.1 Response entries, routinely provided massive string cites that did not justify the stated assertions, and consistently inserted their legal allegations and conclusory assessments—including entire swaths of their expert reports—as statements of "fact," all of which the Court ignored. On multiple occasions. the Plaintiffs' attorneys cited to the allegations in the Complaint, rather than admissible evidence, in

their 56.1 statements; multiple parties inappropriately admitted facts and then proceeded to provide further information in the response. The Defendants, meanwhile, routinely base their 56.1 statements on the plaintiffs' depositions in these cases and then proceed to object to plaintiffs' own citations to those exact same depositions—often the exact same *portion* of the depositions—as inadmissible hearsay (though this characterization is frequently incorrect under the party-opponent admission exception under Federal Rule of Evidence 801(d)(2)(D)).

As made clear throughout the related cases, this Court has the discretion to deem admitted facts that either side does not expressly admit yet fails to dispute with citations to admissible evidence in the record. *See Dade v. Sherwin–Williams Co.*, 128 F.3d 1135, 1139 (7th Cir. 1997) (referring to L.R. 56.1's predecessor rule, the court affirmed the district court's taking as true uncontroverted facts alleged in the movant's statement and supported by references to the record); *see also Harney v. Speedway SuperAmerica, LLC*, 526 F.3d 1099, 1104 (7th Cir. 2008) ("It is not the duty of the court to scour the record in search of evidence to defeat a motion for summary judgment; rather, the nonmoving party bears the responsibility of identifying the evidence upon which he relies."). The Court thus proceeds by crediting only those statements that are adequately supported in the record and relevant to the resolution of the Motions. As explicated in the related cases, Defendants' frequent objections to cited emails on authenticity and hearsay grounds are overruled unless indicated otherwise in the text of the Court's analysis. The few other objections relevant to material facts are addressed below, alongside the <u>relevant</u> facts (that are undisputed unless otherwise indicated).

## I. Background

The Court also, at this point, adopts the general background information established as undisputed in the related cases without repopulating the same record with new citations. That

includes the following: (Former defendant) Chase Real Estate, LLC, owned and managed by Christian Chase, provided certain services to brokers for a fee, including allowing the brokers to use the www.mychaseagent.com domain and the mychaseagent.com email. Defendant Marcin Chojnacki ("Chojnacki") is a licensed real estate broker and was the designated managing broker for the Chase RE Roselle branch during the relevant time period. Robert Rixer ("Rixer") was a real estate broker for Chase RE Roselle during the relevant time period. Former Defendant Laurena "Lori" Mikosz also was a real estate broker for Chase RE Roselle during the relevant time period.

Chojnacki and Rixer jointly own Market Equities, Inc., a Delaware Corporation formed in 2022; Market Equities, Inc. is the sole owner of Illinois Assets as well as EJ Investments (since 2022) which in turn owns Mainstreet Property Management. Defendant EJ Investments (EJ) was formed by Chojnacki and Rixer in 2020 and was initially owned by Chojnacki and his then-fiancé Long (who also share children); in 2022, Chojnacki and Rixer's Market Equities, Inc., assumed ownership of EJ. Chojnacki's mother, Iwona, is EJ's bookkeeper. Rixer, Chojnacki and Long are signers on the EJ Investment bank account. Rixer and Chojnacki also co-own Citypoint Illinois LLC and have both been brokers there since 2023; Rixer became the managing broker for Citypoint in 2023. The Chojnacki Defendants dispute that Long herself worked for Citypoint any earlier than April 2025. Rixer and Chojnacki also co-owned the now dissolved Illinois Assets LLC.

Long is involved in this action through her alleged involvement in some of the financial entities that Plaintiff argues make up the Citypoint/Citipoint Enterprise: now dissolved Defendant First National Financial (FNF), now dissolved entity Defendant TCF National Holdings (TCF), and Prairie Raynor. Long was the sole shareholder, officer and director of FNF prior to its dissolution on December 20, 2024; she was also the sole signatory on FNF's bank account. Although Rixer and Chojnacki created TCF, Long was the sole shareholder and officer of TCF via

FNF; Long was also the sole signatory on the bank account and sole person who had authority to act on behalf of the bank account for TCF, (which Defendants disputed in some cases but admitted on the *Malik* docket (Dkt. 436 ¶ 16), so the Court considers it admitted. Through this organizational structure, Long was the face of TCF; a design that Plaintiff asserts was to conceal Rixer and Chojnacki from the public record, whereas the Chojnacki Defendants assert was a decision made for branding purposes.

Former Defendant Rachel Irwin was an employee of Chojnacki's now dissolved Chojnacki Real Estate, Inc. corporation, and then an employee of former Defendant Midwest Title and Closing Services, which she co-owned with Chojnacki. Irwin was also General Counsel for Rixer and Chojnacki's EJ Investments and a shareholder of XYZABC, Inc., a Delaware corporation that she co-owned with Chojnacki. XYZABC, Inc. was the manager of Midwest Title and Closing Services. Via these entities, Irwin communicated with Chojnacki, Rixer, and Long's lenders, organized entities, prepared operating agreements and bylaws, amendments to bylaws and operating agreements, and other legal documents for Chojnacki, Rixer, Long and their entities; Irwin also acted as "Seller's" attorney for Chojnacki, Rixer, Long and their entities.

This case also features the Murphy Defendants. Murphy was the sole shareholder, President, and Director of 1st Midwest Financial, Inc. ("1st Midwest") (prior to its dissolution) and went to school with Chojnacki. Murphy testified that 1st Midwest's business was to hold title to properties for agents. Murphy views this as a project designed to generate passive income, but Plaintiffs dispute this characterization, arguing that a trier of fact could conclude the purpose was to permit others to shield their identity.

The corporate address initially listed on the Secretary of State's website for 1st Midwest was 1046 Midwest Road, in Northbrook, before being properly corrected to 1046 Midway Road

in Northbrook, which the Murphy Defendants contend was a clerical error while Plaintiff argues it was part of a broader scheme to intentionally misstate the address.

## II. The Lin Connection

With that, the Court turns to the facts that connect Lin with this complicated web of actors. Lin, a California citizen, discovered Chase Real Estate and its offerings through Flip Chicago and Citypoint through a Google search. (Dkt. 183 ¶¶ 1, 11–13; Dkt. 187 ¶ 56). In either late 2020 or early 2021, he submitted an online form through the Chase advertisement; shortly thereafter, Mikosz reached out and began a dialogue discussing Lin's investment goals. (Dkt. 183 ¶ 15; Dkt. 187 ¶ 58). Lin told Mikosz that he was interested in both single-family homes that he could "fix-and-flip" as well as multifamily or multiunit investing opportunities. (Dkt. 183 ¶ 15). Lin originally testified that he could not recall any "significant conversations" pre-purchase with anyone other than Mikosz, but later stated that he had one conversation with Chojnacki around the time of his initial call with Mikosz. (Dkt. 183 ¶ 18). According to Lin, during that phone call he and Chojnacki discussed general real estate investment strategy, not any specifics of any property, and that the conversation centered around Chojnacki's advice to Lin to "do one investment at a time." (Dkt. 183 ¶ 19). Lin admitted that he never met Chojnacki, Rixer, or anyone else at Citipoint in person. (Dkt. 183 ¶ 58). He further admitted that he has never spoken to Rixer at all. (Dkt. 183 ¶ 58).

### a. The Evergreen Property

In July 2021, Mikosz forwarded Lin a multi-unit property located at 3934 Evergreen St., East Chicago, Indiana (the "Evergreen property") and scheduled a meeting to discuss further. (Dkt. 183 ¶ 16). On August 3, 2021, Lin signed a purchase agreement to acquire the Evergreen property "as-is," for a purchase price of $320,000. (Dkt. 183 ¶ 20). Both Evergreen, and the Butternut

Property discussed below, were part of a $750,000 acquisition that Rixer and Chojnacki were involved in. (Dkt. 187 ¶ 103).

There was a significant delay between Lin's signing of the purchase agreement and the closing, a delay of over a year. (Dkt. 183 ¶ 22). That delay was due to the amount of time it took to get the property appraised to the value of the purchase price, and resulting issues with funding. (Dkt. 183 ¶ 22). As part of the due diligence process, Lin had the Evergreen property inspected by an inspector Mikosz referred him to. (Dkt. 183 ¶ 23). Lin testified that the inspection revealed concerns regarding both the condition and occupancy of the property. (Dkt. 183 ¶ 23).

Lin had the Evergreen property appraised multiple times. (Dkt. 183 ¶ 24). The first two appraisals came in under the purchase price, but the third appraisal came in at the purchase price. (Dkt. 183 ¶ 24). Lin did not want to close on the Evergreen property until it was appraised to the purchase price of $320,000, in fact he specifically testified that: "if no one could appraise Evergreen to the 320 number, I didn't want to buy it." (Dkt. 183 ¶ 24). (As in other cases, Plaintiff contends that the documents should not count as an appraisal because they refer to nearby comp properties for its estimates despite the fact that the "sales comparison approach is [often seen as] the most reliable method for appraising the value." *Buchanan Energy (N), LLC v. Lake Bluff Holdings, LLC*, 2017 WL 1232973, at *6 (N.D. Ill. Apr. 4, 2017); nevertheless, the argument that the report should be set aside by a factfinder does not bear on a factual statement about the report's contents.)

Mikosz connected Lin with a lender to finance the project, but the lender refused to approve the deal, since Lin had no experience flipping multifamily properties. (Dkt. 183 ¶ 25). Lin testified that he had to switch lenders in order to get a deal approved, due to his lack of experience and the amount of rehab required on the property. (Dkt. 183 ¶ 25). Mikosz helped Lin find a new lender.

(Dkt. 183 ¶ 25). Lin admitted that the fact that he was having trouble getting funding from the lender was a sign to him that there "might be a real problem" with the property. (Dkt. 183 ¶ 26). In an email he produced, Lin acknowledged that he was aware that repairs were necessary and that they would likely be "out of my pocket." (Dkt. 183 ¶ 26). In an email he produced, Lin admitted that he hoped that he could use the issues that came up in the appraisal and inspection process as leverage for a better price at closing. (Dkt. 183 ¶ 27).

On March 10, 2022, in an email he produced, Lin asked Mikosz that "given the misrepresentation of the units (fully occupied vs not, turnkey vs not, general delay and churn) please negotiate some form of settlement on the earnest monies of $31K total." (Dkt. 183 ¶ 28). Asked in his deposition what Mikosz told him that turned out not to be true, Lin cited 1) that the property did not require significant rehab; 2) that the building was fully rented, and rents could easily be raised to the market standard to turn a profit; 3) the properties were being sold by someone named Bernard Carter at a discount. (Dkt. 183 ¶ 28).

Lin signed an updated purchase agreement for the Evergreen property on June 10, 2022, with Mikosz acting his designated agent. (Dkt. 183 ¶ 32). It was then that he noticed that the seller was not Deodar Evergreen Butternut LLC, an entity he understood to be Carter's, and instead was an entity called "TCF National Holdings, Inc." (Dkt. 183 ¶ 32). Lin asked Mikosz why there was a discrepancy, and Mikosz told him that seller was still Bernard Carter, and that he was the owner of the entity. (Dkt. 183 ¶ 32). The Evergreen property was appraised (with Plaintiff lobbing the same objection as to the term) to the purchase price in the summer of 2022, and Lin closed on the property for $320,000 on October 19, 2022, buying it from TCF. (Dkt. 183 ¶ 33; Dkt. 181 ¶ 5). Lin acquired the Evergreen property through an LLC, "Achilles Real Estate Holdings," an entity he created specifically for this purchase, and of which is the sole member. (Dkt. 183 ¶ 35).

After purchasing the Evergreen property, Lin struggled to manage it. (Dkt. 183 ¶ 37). In the roughly two years that he owned the Evergreen property, he switched management companies three times. (Dkt. 183 ¶ 37). At first, his property was managed by Chojnacki's property management company, Mainstreet Property Management, which was introduced to him by Mikosz. (Dkt. 183 ¶ 37). Lin did not know how many units were in the Evergreen property he was purchasing until after he purchased it, only learning of the number after he discharged Defendants as management. (Dkt. 183 ¶ 20). To date, Lin has never visited the Evergreen property in person. (Dkt. 183 ¶ 21). The renovation costs at the Evergreen property ended up being higher than Lin anticipated. (Dkt. 183 ¶ 36). However, Lin could not recall exactly how much it cost him. (Dkt. 183 ¶ 36). Lin decided to sell the Evergreen property, and initially listed it for $450,000. (Dkt. 183 ¶ 38). He eventually sold it in October of 2024 for $240,000. (Dkt. 183 ¶ 38).

**b. Butternut Property**

On August 9, 2021, Mikosz forwarded him information regarding the property located at 3826 Butternut (the "Butternut" property), a larger multi-unit deal than Evergreen. (Dkt. 183 ¶ 39). 8 days later, Lin signed a purchase agreement for $310,000, on August 17, 2021. (Dkt. 183 ¶ 40). Immediately, there were problems with the financing of the Butternut deal as the lender who Mikosz connected Lin with told him that there was no way he could approve funding for two multi-family properties for someone who had no experience flipping multi-family properties. (Dkt. 183 ¶ 41). Lin had a structural engineer visit the Butternut property, and it was determined that substantial renovations were necessary, specifically the deck needed to be fully demolished and rebuilt because it was not up to code. (Dkt. 183 ¶ 42). On September 26, 2022, a few weeks prior to his closing on the Evergreen deal, Lin decided to pass on the Butternut property. (Dkt. 183 ¶ 43). On March 24, 2023, approximately five months after closing on the Evergreen property, Lin

emailed Mikosz seeking to inquire about the Butternut property again. (Dkt. 183 ¶ 44). On April 1, 2023, Lin signed a new contract for the Butternut property, with a purchase price of $320,000. (Dkt. 183 ¶ 44). Following another appraisal of the Butternut property, Lin decided once again not to move forward with the Butternut deal. (Dkt. 183 ¶ 45). Lin, to date, has never visited the Butternut property. (Dkt. 183 ¶ 46).

**c. The Fix and Flips: Elmwood Park, South Holland, and Alsip Properties**

Lin also acquired three fix-and-flip properties—none of which he ever visited—through his LLC, "Limitless Potential LLC," of which he was the sole owner. (Dkt. 183 ¶¶ 50–51). Lin purchased the Elmwood Park, South Holland, and Alsip properties from an entity called "First Midwest Financial Inc." (Dkt. 183 ¶ 52). Lin claimed that he was under the impression that this entity was a bank because Chojnacki told him about the "overall strategy of purchasing foreclosed properties" and Mikosz confirmed that these specific properties fit that bill. (Dkt. 183 ¶ 52).

For all three properties, Plaintiffs contend that Murphy, through 1st Midwest, acquired the properties for a "discounted price" while Lin was working with Chase, which Defendants dispute as unsupported by the record, as Plaintiff was neither a party nor a third-party beneficiary in the referenced transactions. (Dkt. 187 ¶¶ 78, 81, 84; Dkt. 191 ¶¶ 78, 81, 84). In one example of the acquisition timelines, Mikosz sent Murphy's 1st Midwest docusigned Evans acquisition documents to Chojnacki on December 29, 2021, (while representing Lin) with the message: "Just fyi. Sending to Rachel in a bit." (Dkt. 187 ¶ 87; Dkt. 191 ¶ 87). Lin contends that Chojnacki was ultimately controlling funds through 1st Midwest, which Defendants dispute. (Dkt. 187 ¶ 92; Dkt. 191 ¶ 92).

On September 11, 2021, Lin signed a purchase agreement to acquire the property located at 1623 North 78th Ave, Elmwood Park, Illinois (the "Elmwood Park" property), with Mikosz

acting as his designated agent. (Dkt. 183 ¶ 47). The purchase price for this property was $287,000. (Dkt. 183 ¶ 47). Lin had the property inspected prior to the closing, which occurred on December 7, 2021. (Dkt. 183 ¶ 47).[3]

On December 29, 2021, Lin signed a purchase agreement to acquire the property located at 16410 Evans Ave., South Holland, Illinois (the "South Holland" property), with Mikosz acting as his designated agent. (Dkt. 183 ¶ 48). The purchase price for the South Holland property was $165,000. (Dkt. 183 ¶ 48). Lin had the property inspected prior to the closing, which took place on March 10, 2022. (Dkt. 183 ¶ 48).

On March 7, 2022, Lin signed a purchase agreement to acquire the property located at 11825 Springfield Avenue, Alsip, Illinois (the "Alsip" property), with Mikosz acting as his designated agent. (Dkt. 183 ¶ 49). The purchase price for the Alsip property was $195,000. (Dkt. 183 ¶ 49). Lin had the property inspected prior to the closing. (Dkt. 183 ¶ 49). The closing for this property was on June 2, 2022. (Dkt. 183 ¶ 49). The name of Michele Costello ("Costello"), a title searcher with Former Defendant Lakeland Title, appears as "issuing agent" on the title commitment, but she has since testified that she does not know why her name was there. (Dkt. 187 ¶ 73).

All three properties have since sold. Lin closed on his sale for the Elmwood Park property on July 7, 2022 for $470,000, $183,000 more than he purchased it for. (Dkt. 183 ¶ 53). He claims that there were costs associated with the renovations; Defendants say he has not provided support for those costs, which Plaintiff disputes without citation to said support. (Dkt. 183 ¶ 53). The same

[3] The Elmwood Park Property is also the subject of a related Rule 11 Motion in this case still pending in front of the Court. Plaintiff contends that "Without Lin's knowledge or consent, Chojnacki's father, Zbigniew Chojnacki, signed a presale inspection affidavit as Lin's POA accepting responsibility for presale repairs to the Elmwood Park property," but the Chojnacki Defendants put forth an email in which "Lin himself provided the Village of Elmwood Park a power of attorney form expressly authorizing Zbigniew Chojnacki to do just that." (Dkt. 187 ¶ 82).

is true regarding renovations at the South Holland property, which Lin sold in a sale that closed on March 24, 2023, for $279,000--$114,000 more than he purchased it for, (Dkt. 183 ¶ 54), as well as the Alsip property, for which Lin closed on October 14, 2023, for $315,000 ($120,000 more than he purchased the property for). (Dkt. 183 ¶ 55).

Lin seeks $145,417 for the difference that the Defendants allegedly pocketed between purchasing the four properties and then selling them to Lin, as well as unspecified damages for unexpected and undisclosed repairs, unexpected vacancies, undisclosed building violations. (Dkt. 187 ¶ 115; Dkt. 191 ¶ 115).

## LEGAL STANDARD

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see, e.g.*, *Reed v. Columbia St. Mary's Hosp.*, 915 F.3d 473, 485 (7th Cir. 2019). "A dispute of material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Johnson v. Dominguez*, 5 F.4th 818, 824 (7th Cir. 2021). The Court "consider[s] all of the evidence in the record in the light most favorable to the non-moving party." *Skiba v. Ill. Cent. R.R. Co.*, 884 F.3d 708, 717 (7th Cir. 2018) (citation omitted). "The controlling question is whether a reasonable trier of fact could find in favor of the non-moving party on the evidence submitted in support of and opposition to the motion for summary judgment." *White v. City of Chi.*, 829 F.3d 837, 841 (7th Cir. 2016) (internal citations omitted). "[S]peculation and conjecture" also cannot defeat a motion for summary judgment. *Cooney v. Casady*, 735 F.3d 514, 519 (7th Cir. 2013). In addition, not all factual disputes will preclude the entry of summary judgment, only those that "could affect the outcome of the suit under governing law." *Outlaw v. Newkirk*, 259 F.3d 833, 837 (7th Cir. 2001) (citation omitted).

## DISCUSSION

After removing the former Defendants, the remaining landscape of Count I is as follows: Lin alleged that the Chojnacki Defendants, the Murphy Defendants, and Long individually violated 18 U.S.C.§ 1962(c), (d), (Dkt. 4 ¶¶ 170–180), [4] while FNF violated just § 1962(d), (*id.* at ¶¶ 181–191). Given the fact that the Defendants filed substantively comparable motions for summary judgment in all of the related cases, the Court assumes familiarity with the analysis laid out in *Malik et al v. Prairie Raynor LLC et al*, 23-cv-1182, and related dockets. Indeed, in this

[44] The Complaint says "18 U.S.C. 1962(c), (d)," for these Defendants, but does not discuss the specific conspiracy aspect; nevertheless, the Complaint clearly indicates where FNF is only facing allegations under § 1962(d).

case, the Parties regurgitate their arguments with regard to the RICO claims almost verbatim, so the Court need not re-explicate its analysis on the same: there can be no "lost investment bargain" theory of RICO injury where the value of property sold is not as high as represented, but is at least what the Plaintiffs paid for it. On this record, nothing indicates that Lin did not get the benefit of his bargain.

It is altogether different, however, to allege a RICO violation where the RICO scheme diminishes the actual value of property—in this case, Lin's claims about back-end damages. Defendants contend that Lin's claims about additional costs, repairs, and delinquent tenants are insufficient and vague, but those arguments speak not to the validity of a claimed injury for RICO standing purposes and instead go to the scope of damages (if any), a query that is best fit for a jury's resolution. While "logically related, a property interest and a measure of damages are not the same thing." *See Ivar v. Elk River Partners, LLC*. 705 F. Supp. 2d 1220, 1234 (D. Colo. 2010). Thus, Lin's claims can proceed on the alleged financial injuries descending from the representations made around the actual transaction. The Chojnacki Defendants' other general attempts to argue that any bad acts were Mikosz' alone and that there was no enterprise falls flat on the same grounds as explained in the related cases. A full review of the record, including facts contested and uncontested, could conceivably allow a reasonable jury to find that the Chojnacki Defendants participated in the operation or management of an enterprise to lure in investors through misrepresentations of building ownership, condition, and—with regard to tenants—its occupancy and rental rates.

The Court next turns to Long's primary contention in support of her Motion: that the nexus between her and the enterprise is "solely based on the alleged relationship" with Chojnacki. (Dkt.

171-1 at 9). Yet this is a misstatement of the record. Lin purchased property from TCF directly. This Court cannot grant summary judgment on these facts.

There is one twist in the Long Defendants' argument: during his testimony, Lin was asked repeatedly why FNF was included in the action when it was not an entity that he purchased any of his four properties from, nor was it involved in property management, questions to which he said he could not recall the answer; Plaintiff disputes this without further explication as to its inaccuracy. (Dkt. 181 ¶ 10; Dkt. 171-1 at 10). Plaintiff's briefing also does not shed any light on this appearance. Thus, the Motion for Summary Judgment as to FNF (and FNF alone) is granted in full. *See United States v. 5443 Suffield Terrace, Skokie, Ill.*, 607 F.3d 504, 510 (7th Cir. 2010) (at the summary judgment stage, it is "not the district court's job to sift through the record and make (a party's) case for him").

Further, the analysis laid out in the related cases governs Long's and the Murphy Defendants' contentions that the allegations of wire and mail fraud in the Amended Complaint are directed at other co-Defendants. (Dkt. 171-1 at 6; 173-1 at 6). Under § 1962(d), that contention is irrelevant. Liability under that portion of the statute requires only that the defendant agree that "*someone* would commit at least two predicate acts to accomplish these goals" even if she herself does not. *DeGuelle v. Camilli*, 664 F.3d 192, 204 (7th Cir. 2011) (emphasis added). Of course, it is ultimately possible for a jury to find that the evidence showing that these Defendants' financial involvement with regard to the property ownerships was entirely legitimate. Yet the argument that NO reasonable jury could find for Plaintiff on this claim is unpersuasive.

Plaintiff's evidence, though shaky at times, could sufficiently tie the Murphy and Long Defendants to the enterprise (even aside from the prior romantic relationship with Long and Chojnacki, which would be insufficient on its own to meet this standard). A § 1962(c) claim does

not require proof that a defendant was the exclusive "boss" of the operation so long as a jury could find him reasonably involved in managing it. *See Muskegan Hotels, LLC v. Patel*, 986 F.3d 692, 698 (7th Cir. 2021) ("Lower-rung participants and even third-party outsiders can be liable, provided they play a part in operating or managing the enterprise"). The significant financial overlap, alleged lies regarding property ownership, entanglements disguising actual owners, and copious legal entities could allow a jury to infer the Long and Murphy Defendants knowing participated in the scheme to saddle investors with misrepresented properties. Although mere allegations of a conspiracy are insufficient to withstand a motion for summary judgment, a "conspiracy may be proven by circumstantial evidence and should not be taken from the jury as long as there is a possibility that a jury can reasonably infer from the circumstances that the required elements of conspiracy have been met." *See Chicago Miracle Temple Church, Inc. v. Fox*, 901 F.Supp. 1333, 1348 (N.D.Ill.1995). Although it is a close question whether a jury could find that there was an agreement, drawing all inferences in favor of Plaintiffs, the Motions for Summary Judgment on Count I are otherwise denied.

**I. State-Law Claims (Counts II–VI)**

Next, Chojnacki moves for summary judgment on the Chen Plaintiffs' state law claims for common-law fraud (Count II), violation of the ICFA (Count III); violation of the IRELA (Count IV); and negligent misrepresentation (Count V). (Dkt. 175). All sets of Defendants filed for summary judgment on Count VI, unjust enrichment. Plaintiffs' responses on the issues offer scant case law, instead broadly regurgitating the generalized animating grievances of the amended complaint. Accordingly, most of the state law claims cannot survive this stage in the litigation.

**a. Count II: Common Law Fraud and Count V: Negligent Misrepresentation**

"In order to establish fraud under Illinois law, a plaintiff must prove that (1) defendant made a false statement; (2) of material fact; (3) which defendant knew or believed to be false; (4) with the intent to induce plaintiff to act; (5) the plaintiff justifiably relied on the statement; and (6) the plaintiff suffered damage from such reliance." *Houben v. Telular Corp.*, 231 F.3d 1066, 1074 (7th Cir. 2000) (citing *Williams v. Chicago Osteopathic Health Sys.*, 654 N.E.2d 613, 619 (Ill. 1995)).

Negligent misrepresentation has essentially the same elements, except "the defendant need not know that the statement is false. His own carelessness or negligence in ascertaining its truth will suffice for a cause of action." *Doe v. Dilling*, 228 Ill. 2d 324, 360 (Illinois 2008). "For negligent misrepresentation, a plaintiff must also allege that the defendant owes a duty to the plaintiff to communicate accurate information." *Id.* (citing *Board of Education of City of Chicago v. A, C & S, Inc.,* 546 N.E.2d 580 (Illinois 1989)).

Starting with Count II: the Chojnacki Defendants argue that the record contains no evidence that Chojnacki intentionally misrepresented anything to Lin, noting that the only alleged conversation involves Chojnacki offering a generic description of the advantages of full-service real estate firms. (Dkt. 176 at 9-10). Plaintiff makes no attempt to dispute this picture, returning instead to the general theory of the 15 related cases rather than any specific allegedly false statements from the Chojnacki Defendants. (Dkt. 185 at 23). As courts have often admonished, "summary judgment is the 'put up or shut up' moment in the life of a case," *see, e.g.*, *In re Airadigm Communications, Inc.*, 616 F.3d 642, 657 (7th Cir.2010), and while it is not entirely impossible that Lin might have made a case against some or all of the Chojnacki Defendants, it is neither required nor appropriate for the Court to "sift through the record and make [the] case for him." *See 5443 Suffield Terrace*, 607 F.3d at 510. Mere conclusory assertions, whether made in pleadings or

in affidavits, are not sufficient to defeat a proper motion for summary judgment. *First Commodity Traders, Inc. v. Heinhold Commodities, Inc.*, 766 F.2d 1007, 1011 (7th Cir.1985). Accordingly, the Chojnacki Defendants are entitled to summary judgment on Count II.

Returning briefly to the negligent misrepresentation claim:[5] Plaintiff did not specifically allege a duty in the Amended Complaint. (Dkt. 4 at 37). Nor does Plaintiff meaningfully address the Defendants' arguments as to negligent misrepresentation in the Response. (Dkt. 185 at 24-25). Ultimately, though, what dooms Plaintiff's claim here is the same lack of prosecution that impedes the common law fraud claim. After the defendant has made its showing, the non-moving party must come forth with evidence showing what facts are in actual dispute. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–24 (1986). If the non-moving party fails to do so, summary judgment is proper. *United States v. Selenske*, 882 F.2d 220 (7th Cir.1989). Plaintiffs do not make the requisite arguments here, and the court will not do it for them. *See Little v. Cox's Supermkts.*, 71 F.3d 637, 641 (7th Cir. 1995) (holding that the court "is not required to scour the party's various submissions to piece together appropriate arguments" as it "need not make the lawyer's case").

**b. Count III: ICFA**

In Count III, Plaintiff alleged that Chojnacki violated Illinois's consumer protection statute, the ICFA. *See* 815 ILCS 505/1–505/12. "To prevail on a claim under the ICFA, a plaintiff must plead . . . that the defendant committed a deceptive or unfair act with the intent that others rely on the deception, that the act occurred in the course of trade or commerce, and that it caused actual damages." *Benson v. Fannie May Confections Brands, Inc.*, 944 F.3d 639, 646 (7th Cir. 2019)

[5] While Illinois law generally bars plaintiffs from asserting tort claims such as negligent misrepresentation where they seek to recover only economic losses, it is subject to certain exceptions where "one who is in the business of supplying information for the guidance of others in their business transactions makes negligent representations," an exception that has been applied to real estate brokers. *See Am. Inter-Fid. Corp. v. M.L. Sullivan Ins. Agency, Inc.*, 2016 WL 3940092, at *8 (N.D. Ill. July 21, 2016) (collecting cases). The named real estate broker on Lin's sale contract was Mikosz herself, who has settled her claim with Lin.

(quotation marks omitted). "The Illinois Consumer Fraud Act affords broader protection to consumers than the cause of action available under common-law fraud." *Letoski v. Coca-Cola Co.*, 753 F. Supp. 3d 650, 664 (N.D. Ill. 2024)*; Martin v. Heinold Commodities, Inc.*, 643 N.E.2d 734, 751 (Illinois 1994) ("[T]he intent of the Consumer Fraud Act was to lessen the burden of proof in a claim for certain misrepresentations."). "Therefore, to state a cause of action for statutory fraud, a party need not prove all the elements of common law fraud." *Hanson-Suminski v. Rohrman Midwest Motors, Inc.*, 898 N.E.2d 194, 203 (Ill. App. 2008) (citation omitted).

" 'Intent' under the Act means 'that the defendant intends for the plaintiff to rely on the deception' rather than 'the defendant's intent to deceive' under common-law fraud." *Letoski*, 753 F. Supp. 3d at 664. Conduct is deceptive "if it creates a likelihood of deception or has the capacity to deceive" a "reasonable consumer." *Benson*, 944 F.3d at 646. It is unfair if it offends public policy; is "immoral, unethical, oppressive, or unscrupulous"; and causes substantial injury to consumers. *Id.* at 647.

A buyer must prove either 1) "the buyer would have acted differently knowing the information" or the act "concerned the type of information upon which a buyer would be expected to rely in making a decision whether to purchase." *Hanson-Suminski*, 898 N.E.2d at 203 (citing *Connick v. Suzuki Motor Co.*, 675 N.E.2d 584, 584 (Illinois 1996)). "Furthermore, a plaintiff's actual reliance is not required, but a plaintiff must show that defendant's consumer fraud proximately caused their injury." *Id.*

Here, a reasonable jury could find that Chojnacki's behaviors, even if often one-step-removed from direct communication with Lin, was designed to induce Lin's reliance on the inefficient and old-school seller narrative. Plaintiff also has presented evidence of a potential scheme to convince sellers of a bargain real estate deal that simultaneously provided Defendants

with a near-guaranteed investment opportunity. A jury could find that the scheme alleviated some of the traditional risks of real estate investments for Defendants—namely, the ability to flip the property for a profit—by ensuring a buyer was ready to go on the flip before Defendants even finalized their initial purchase. On this record, it remains disputed whether Chojnacki's conduct "concerned the type of information upon which a buyer would be expected to rely in making a decision whether to purchase." *Hanson-Suminski*, 898 N.E.2d at 203.

Defendants also contend that Lin has presented no evidence of damages because he has not sufficiently tied damages to this part of his claim. (Dkt. 176 at 11). Yet Lin has offered some evidence on damages from unexpected repairs, unexpected code compliance, unexpected building code violations and evictions, and it is up to the jury to assess the validity, if any, of that sum. It is true that the "as-is" nature of the sale may impede the back-end damages claims, but if a jury finds that the sale itself was a product of illegal behavior, it may assess the claim differently.

In analyzing a claim under the Illinois statute, courts consider "the totality of the information made available to the plaintiff." *Benson*, 944 F.3d at 646 (citing *Davis v. G.N. Mortg. Corp.*, 396 F.3d 869, 884 (7th Cir. 2005)). That inquiry, by its definition, will peer beyond the singular "seller's identity" quotation to assess the full picture available to Lin in his dealings with Defendants.

**c. Count IV: Illinois Real Estate License Act**

Lin did not acknowledge that he had ever brought an IRELA claim in his summary judgment briefing. When a party fails to address an argument in his summary judgment response, it is deemed a waiver. *See Roe–Midgett v. CC Servs., Inc.*, 512 F.3d 865, 876 (7th Cir.2008); *Palmer v. Marion County*, 327 F.3d 588, 597–599 (7th Cir.2003); *Schramm L. Grp., LLC, v. Pitney Bowes Inc.*, 2026 WL 636820, at *2 (N.D. Ill. Mar. 6, 2026) ("The Court needn't consider . . .

'underdeveloped, conclusory, and undeveloped' argument[s].") (cleaned up). Accordingly, the Chojnacki Defendants are entitled to summary judgment on Count IV.

**d. Count VI: Unjust Enrichment**

That leaves the final state-law claim: Count VI: unjust enrichment. All three sets of Defendants moved for summary judgment on Count VI, the only state-law claim pleaded against the Murphy Defendants and the Long Defendants. As this Court has already spelled out in *Malik*, Illinois law does not consider unjust enrichment an independent cause of action. *See Benson v. Fannie May Confections Brands, Inc.*, 944 F.3d 639, 648 (7th Cir. 2019) (finding no standalone claim for unjust enrichment under Illinois law); *Flores v. Aon Corp.*, 242 N.E.3d 340, 356 (Ill. App. 2023) (quoting *Charles Hester Enterprises, Inc. v. Illinois Founders Insurance Co.*, 484 N.E.2d 349 (Ill. App. Ct. 1985), *aff'd*, 499 N.E.2d 1319 (Ill. 1986)).

To the extent that the unjust enrichment claim is premised on the ICFA, the unjust enrichment claim can survive dismissal with regard to the Chojnacki Defendants. *See id.* at 741–42; *Ass'n Ben. Servs. v. Caremark Rx, Inc.*, 493 F.3d 841, 855 (7th Cir. 2007) ("[W]here the plaintiff's claim of unjust enrichment is predicated on the same allegations of fraudulent conduct that support an independent *claim* of fraud, resolution of the fraud claim against the plaintiff is dispositive of the unjust enrichment claim as well."). The unjust enrichment claim is barred as a tag-on to the alternative state law claims for the Chojnacki Defendants. Similarly, because there are no alternative state law claims as to the Long and Murphy Defendants, their Motions are granted with regard to Count VI. *See Mashallah, Inc. v. W. Bend Mut. Ins. Co.*, 20 F.4th 311, 324 (7th Cir. 2021). ("To the extent that the unjust enrichment claim is premised on the ICFA or

[common-law fraud] claims, the unjust enrichment claim cannot survive the proper dismissal of those matters.").

## CONCLUSION

For the below reasons, the Chojnacki Defendants' Motion for Summary Judgment [175], the Long Defendants' Motion [171], and the Murphy Defendants' Motion [173] are granted in part and denied in part. The Motions are granted with regard to Plaintiff's attempt to proceed under 18 U.S.C. § 1964 on a theory of speculative profit loss; they are otherwise denied as to the RICO claims, which remain in the case in accordance with the analysis herein. Further, the Long Defendants' Motion is granted in full as applied to FNF's liability (but not Long herself). The Court also grants the Murphy Defendants' and the Long Defendants' Motion on Count VI for Unjust Enrichment. The Court grants the Chojnacki Defendants' Motion with regard to common-law fraud (Count II); violation of the IRELA (Count IV); and negligent misrepresentation (Count V); it denies the motion as to violation of the ICFA (Count III) and the follow-on claim of unjust enrichment (specifically for the Chojnacki Defendants) (Count VI), which remain in the case and will proceed to trial unless the parties can reach a settlement.

Virginia M. Kendall
United States District Judge

Date: September 9, 2026